[No. 36450. Department One. May 14, 1964.]

HAROLD DABROE et al., *Appellants*, v. THE RHODES COMPANY et al., *Respondents*.*

*Sterbick, Manza, Moceri & Sterbick,* by *Michael S. Manza,* for appellants.

*Williams, Lanza, Kastner & Gibbs,* by *Paul C. Gibbs,* for respondents.

*Reported in 392 P. (2d) 317.

HILL, J.—We are here concerned with claimed errors occurring in the trial of an escalator-accident case.

Harry and Louise Dabroe, husband and wife, brought an action to recover for damages sustained by Mrs. Dabroe[1] when an escalator on which she was riding from the second to the first floor of a department store "suddenly and abruptly without warning, stopped and began to jerk violently."[2] This was caused by a small boy getting the toe of his tennis shoe caught in the side of the escalator when he was 4 steps from the bottom, i.e., the first floor. When he reached the bottom, the rubber sole of the tennis shoe became so wedged in the mechanism that it brought the escalator to a sudden stop.

The plaintiff was not knocked down, nor was anyone else on the escalator injured. The "jerking" complained of continued for about 5 seconds. The plaintiff held on with both hands to the railing, but was tossed to and fro. She gritted her teeth so hard that her lower plate was cracked. Extensive injuries were claimed, with damages exceeding $36,000.

The verdict of the jury was for the defendants, The Western Department Stores and The Rhodes Company, the owner and the operator of the store. (Other defendants had been dismissed by the trial court.)

From the judgment of dismissal, entered on the jury's verdict, this appeal was taken.

There is no contention that the jury could not, under the evidence before it, have arrived at the conclusion that the defendants were not negligent. The plaintiffs urge, however, that there were several prejudicial trial errors which prevented them from having a fair trial.

We have concluded that two of these assignments of error have merit and that one, if not both, require the granting of a new trial.

The trial court refused an instruction requested by the plaintiffs, stating that:

[1]When we speak of "the plaintiff," we will be referring to Mrs. Dabroe.

[2]As alleged in the complaint.

"It was the duty of the Defendants to exercise the highest degree of care consistent with the practical operation of its escalator to protect its passengers from the danger of injury from malfunctions or defects of which they knew or should have anticipated from facts and circumstances known to them."

 The defendants urge that the highest degree of care should not be required in the operation of escalators and that the standard of reasonable care is sufficient. They suggest also that the standard of the "highest degree of care" has not been directly applied to the operators of escalators in this jurisdiction, citing *Blood v. Allied Stores Corp.* (1963), 62 Wn. (2d) 187, 381 P. (2d) 742. In that case, the jury was instructed:

" '. . . The defendant, while not an insurer of the safety of passengers on its escalators, owes them the highest degree of care for their safety which is consistent with the practical operation of the escalators.' " (p. 190)

There was no exception to that instruction in the *Blood* case, and we there assumed, without deciding, that it was a proper instruction.

Without further assumption, we now decide that it was and is a proper instruction. It would be a bit ridiculous for us to require a lesser degree of care for a passenger on an escalator than we held some 60 years ago to be applicable to a passenger in an elevator. See *Edwards v. Burke* (1904), 36 Wash. 107, 110, 78 Pac. 610.

In that case, we applied the highest-degree-of-care rule of the carrier cases to elevators, and Judge Dunbar used the following quotation (p. 111):[3]

" 'Modern judicial authority assimilates the legal status of the owners or occupiers of buildings who construct or operate passenger elevators therein, whereby persons are conveyed from one story in the building to another, to that of a common carrier of passengers and imposes upon such persons the same extraordinary obligation of care and skill;' "

---

[3]Thompson, Commentaries on the Law of Negligence, Vol. 1, p. 980.

We approved, in that case, an instruction stating:

" 'The liability of the operator of such an elevator is somewhat analogous to that of a common carrier. While the payment of fare is not required, yet the operator of an elevator, having invited the public to enter, assumes to exercise the highest degree of care in the operation of that elevator that is consistent with practical conditions.' " (p. 110)

We have reiterated this rule in *Perrault v. Emporium Department Store Co.* (1913), 71 Wash. 523, 526, 128 Pac. 1049; *Atkeson v. Jackson Estate* (1913), 72 Wash. 233, 237, 130 Pac. 102; and *Getty v. Hutton* (1920), 110 Wash. 124, 126, 188 Pac. 10. (The *Perrault* and *Atkeson* cases were both departmental decisions; they were later heard *en banc* and the court adhered to the departmental decisions. See 74 Wash. 699 and 700.)

The defendants urge further that, in any event, the trial court had already instructed the jury that the defendants were obligated to use the highest degree of care consistent with the practical operation of their escalator, and they refer to instructions Nos. 10 and 15. By the former, the jury was told:

" . . . The basic issue is whether the Defendant discharged its duty of exercising the highest degree of care consistent with the practical operation of its escalator."

And, by the latter, the jury was advised that:

"The operator of an escalator, having invited the public to enter, must exercise the highest degree of care in the operation of that escalator consistent with the practical operation thereof."

By these instructions, the jury had been adequately instructed on the degree of care with which the defendants were charged, but there was no application of it to the claimed negligence in this case, except in the instruction refused where reference is made to the duty to use the highest degree of care consistent with the practical operation of their escalator,

" . . . to protect its passengers from the danger of injury from malfunctions or defects of which they [the

defendants] knew or should have anticipated from facts and circumstances known to them."

Nowhere in the instructions is there any reference to what the claimed negligence of the defendants might be, except the statement of plaintiffs' contention in instruction No. 1, "that the defendants negligently operated and maintained the escalator."

Only the instruction, which was refused, gave any indication of the plaintiffs' theory of negligence, i.e., (1) that the defendants knew from experience that children's rubber soled shoes or boots did get caught in the escalators, as in this case, and that the defendants did not have adequate signs to warn of the danger of such happenings; and (2) that the defendants had not equipped their escalator with microswitches which were available and would produce a "sliding stop," immediately after footgear became caught in an escalator, instead of a "collision type stop," when a passenger whose foot was caught reached the bottom of an escalator.

■ The plaintiffs were, of course, entitled to have their theories of the case presented to the jury by proper instructions, there being evidence to support them;[4] and their right was not affected by the fact that the law was covered in a general way by the instructions given. *DeKoning v. Williams* (1955), 47 Wn. (2d) 139, 141, 286 P. (2d) 694; *Allen v. Hart* (1948), 32 Wn. (2d) 173, 176, 201 P. (2d) 145.

It was prejudicial error not to give this instruction which, in the event of a new trial, might well be combined with instruction No. 15, which was given, thus avoiding repetition regarding the applicable standard of care.

Another meritorious assignment of error has to do with the cross-examination of Dr. Myron Kass with relation to an article that appeared in the American Medical Associa-

---

[4]The escalator accident with which we are concerned occurred in August of 1958. The evidence was that during the preceding November and December there were four instances of children's footwear being caught in the sides of the escalator; that the only warning signs were "Keep hands on the rail," and "No strollers" (claimed by plaintiffs to be inadequate); and that there was a microswitch available which, if installed, would bring escalators to a smooth stop immediately after footgear became caught.

tion Journal of October 27, 1956, entitled "Survey of One Hundred Cases of Whiplash Injury after Settlement of Litigation."

We have serious doubt whether the article in question is a medical treatise. It seems to us more a statistical study indicating that a substantial number of the people having whiplash injuries, who were contacted in this particular study, recovered after the termination of the litigation (54 per cent with no residual complaints; 34 per cent with minor symptoms not requiring therapy). The research was done by a senior student of the University of Tennessee Medical School, and the published analysis was by Dr. Nicholas Gotten. The study was supported by a grant to the Department of Neurology from the University of Tennessee School of Medicine. Despite the fact that it was read before the Section on Nervous and Mental Diseases at the 1956 annual meeting of the American Medical Association, it seems to us no more entitled to be called a medical treatise than any other statistical study. Its value depends not upon the reputation of any medical school or department thereof, but upon the classifications made by the senior student who made the study, and upon the manner in which the individuals to be interviewed were selected.

Under somewhat the same circumstances, we said that a similar statement,[5] even though it appeared in a book by a

---

[5]The statement appears in the following excerpt from *Stone v. Seattle* (1903), 33 Wash. 644, 649, 650, 74 Pac. 808:

"It is also insisted that the court erred in sustaining objections to questions asked Dr. Faulk on cross-examination. Dr. Faulk had testified as a medical expert on behalf of respondents, and the following colloquy occurred:

" 'Q. I will ask you now if you are acquainted with the work on medicine known as the "Practice of Medicine," by Osler. A. Yes sir. Q. Do you consider it one of the standard works? A. Yes sir. Q. Now, if Osler lays down the proposition that "A majority of patients with traumatic neurosis recover in railway cases. So long as litigation is pending and the patient is in the hands of lawyers the symptoms usually persist. Settlement is often the starting point of a speedy and perfect recovery with a full return to health, after presenting the most aggravating symptoms with complete disability of three to five years' duration."

recognized medical authority, does not pertain in any way to the medical profession or the science of medicine, but is simply a reflection upon the honesty of individuals generally who meet with accidents caused by railroads.

However, we will assume, for the purposes of this opinion, that it is a medical treatise. We will also assume that the purpose for which it was used was to contradict, impeach, or discredit Dr. Kass—and not merely to get before the jury statements made out of court by a person not subject to cross-examination.[6]

■ The general rule is that medical books and treatises are not admissible to prove the truth of the statements therein contained. *Ross v. Foss* (1958), 77 S. D. 358, 363, 92 N. W. (2d) 147. 6 Wigmore, Evidence (3d ed. 1940) §§ 1690-1700; McCormick, Evidence § 296; *cf. Skodje v. Hardy* (1955), 47 Wn. (2d) 557, 561, 288 P. (2d) 471; and annotation in 60 A.L.R. (2d) 77, "Use of medical or other scientific treatises in cross-examination of expert witnesses."

However, the use of textbooks and medical treatises for the cross-examination of medical experts, for the purpose of testing their knowledge and for the purpose of contradicting them or discrediting them, is almost universally recognized, although, as pointed out in the A.L.R. Annotation, *supra,* various limitations are imposed.[7] Some cases take the view that the expert may be examined upon the basis of treatises which he has recognized as having authoritative status, whether or not he relied on them in

---

I will ask you if that is a correct announcement of medical science relating to this disease that you have described.' "

"It would seem plain that the only effect that a statement of this kind could have on a jury would be to prejudice it against claims of this character. Even if it were pertinent, it is but hearsay testimony, and on a subject entirely disconnected with the matters at issue, and does not pertain in any way to the medical profession or science of medicine, but is simply a reflection upon the honesty of individuals generally who meet with accidents caused by railroads."

[6]Somewhat ironically, the consideration of this particular article was injected into the cross-examination of Dr. Kass by counsel for one of the defendants subsequently dismissed from the case, thus throwing the justification of its use on counsel not responsible therefor.

[7]60 A.L.R. (2d) 77 at page 79.

forming his opinion. Washington can certainly be included in this group. *Cameron v. Benefit Ass'n of R. Employees* (1940), 6 Wn. (2d) 440, 443, 444, 107 P. (2d) 1096. There the expert had recognized the authority of the text on which he was being cross-examined, and it was held prejudicial error to rigidly limit the cross-examination; on the other hand, in *State v. Mesaros* (1963), 62 Wn. (2d) 579, 583, 384 P. (2d) 372, where the expert did not admit a certain text to be either authoritative or standard, it was held not to be error to refuse to permit cross-examination.

Dr. Kass stated that he had read the article; however, he at no time conceded that he regarded it as other than what it was purported to be, *i.e.*, a study of one hundred whiplash cases. There was no showing that it represented the views of the Department of Neurology at the University of Tennessee, as some of the questions implied. The only identification of Dr. Nicholas Gotten, who wrote the article, is in his opening sentence, "Some months ago we neurosurgeons practicing in Memphis, Tenn. . . ." A note says, "The following neurosurgeons cooperated in this study [9 doctors are listed]." There was nothing to establish that the views expressed in the article were other than those of Dr. Gotten, based on the survey made by a senior medical student.

■ We agree with the defense that an expert should not be permitted to block cross-examination by refusing to concede that a text or a treatise is authoritative; but, absent that concession, the burden of proving that the text or treatise is authoritative should be upon the cross-examiner.[8]

That burden was not sustained in this case, and the jury should have been instructed to disregard so much of the

---

[8]We have never specifically so stated the rule, but it seems to follow from our opinion in *State v. Mesaros, supra,* where, while upholding the trial court in refusing to permit cross-examination by reference to a test which the expert witness did not admit to be authoritative, we said (p. 583): "The appellant failed to lay the necessary foundation of showing that the textbook he proposed to use on cross-examination was recognized as authoritative." This implies that we recognize the existence of other ways of showing that a textbook or treatise is authoritative in addition to the admission of the expert witnesses being cross-examined.

cross-examination of Dr. Kass as relates to the article in question, either because it was not a medical treatise, or because, if it was a medical treatise, it was not established to be authoritative.

We are in doubt as to whether this error, standing alone, was so prejudicial as to require a new trial. Assuming that cross-examination related solely to the amount of damages sustained by reason of the character and extent of the injuries sustained, the cross-examination would have been harmless, if the jury reached its verdict solely on the issue of liability. However, the defendants not only denied any negligence, but denied the allegations of injury, and the cross-examination may conceivably have been material on the issue of whether there were actually any injuries.

However, if the jury had found any liability, it is difficult to believe that some recovery would not have been allowed. Dr. Robert W. Florence, the defendants' witness, testified:

" . . . I could find no really abnormal objective findings that could be definitely attributed to this accident. And, of course, I also noted that there was a rather marked degree of nervous tension involved. It was my opinion that with a program of treatment consisting of physical therapy principally that she should recover. And I did not believe that she would have any permanent disability resulting from this accident."

While the doctor did not believe there was any permanent disability, he recognized the existence of some disability.

We do not need to resolve the doubt, since we have, for another reason, determined that a new trial must be granted. We do, however, point out that on a retrial there should be no cross-examination on this article unless its authoritative character is conceded or proved.

█ The remaining assignments of error are not persuasive. We see no basis for the claim that this is a res ipsa loquitur case, inasmuch as the evidence introduced by the plaintiffs made clear how the event, causing the injuries to the plaintiff wife, occurred. *Engen v. Arnold* (1963), 61 Wn. (2d) 641, 647, 379 P. (2d) 990; *Capen v. Wester* (1961),

58 Wn. (2d) 900, 902, 365 P. (2d) 326; *Chase v. Beard* (1959), 55 Wn. (2d) 58, 67, 68, 346 P. (2d) 315.

In any event, the plaintiffs got their case to the jury, which is all that res ipsa loquitur could have done for them. *Chase v. Beard, supra.*

Neither can we see any prejudice in the claimed repetitious and overlapping instructions on the burden of proof of negligence. Our examinations, through the years, of instructions requested and instructions given, indicate that our trial judges are rather skillfully winnowing the wheat from the chaff, but that there is an inordinate amount of chaff! The increasing use of uniform jury instructions is eliminating prolixity and repetition.

There is here some repetition, but as we said in *Cantrill v. American Mail Line* (1953), 42 Wn. (2d) 590, 599, 257 P. (2d) 179,

". . . While each party is entitled to have his theory of a case presented in instructions to the jury, it is within the discretion of the trial court to determine how many instructions should be given regarding each litigant's theory of the case. . . ."

Our reading of the instructions leaves no feeling of overemphasis creating prejudicial error. However, we would not want the trial court, in the event this case is tried again, to feel that it was "locked in" by our approval of the claimed repetitious instructions as the law of the case, and any instructions which the trial court deems to be repetitious should be eliminated.

The judgment appealed from is set aside, and a new trial is granted. The costs of the prevailing party will abide the result of the action.

OTT, C. J., ROSELLINI, HUNTER, and HALE, JJ., concur.

___

July 13, 1964. Petition for rehearing denied.