THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* THOMAS BEHNKE, Defendant-Appellant.

Fifth District    No. 75-45

Opinion filed August 26, 1976.

JONES, J., dissenting.

Michael L. Pritzker, Marvin Jay Glass, and David M. Schneider, all of Pritzker and Glass, Ltd., of Chicago, for appellant.

Robert H. Howerton, State's Attorney, of Marion (Bruce D. Irish and Myra J. Brown, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE GEORGE J. MORAN delivered the opinion of the court:

Appellant Thomas Behnke was indicted for the Class 1 felony of unlawful delivery of 30 grams or more of a substance containing lysergic acid diethylamide (LSD) in violation of section 401 of the Controlled Substances Act (Ill. Rev. Stat. 1973, ch. 56½, par. 1401(a)(8)). He was found guilty by a jury in the circuit court of Williamson County and was sentenced to not less than four years nor more than 12 years in the penitentiary.

On appeal the appellant challenges the constitutionality of the statute under which he was convicted. Alternatively, he urges us to reverse his conviction on the grounds that the trial court erred in allowing the State to cross-examine the defense's expert with a manual published by a drug enforcement agency of the federal government. The appellant argues that the status of this document as a "learned treatise" was not established and its use was therefore prejudicial.

According to the testimony of an undercover agent from the Illinois Bureau of Investigation, on December 17, 1973, Thomas Behnke sold him 1000 tablets which were purported to contain LSD. The pills were sent to the Illinois Bureau of Identification for testing by the State's supervising criminalist, Daniel Lecocq. He testified as to the tests he had performed and concluded that the substance involved was LSD. The defense's only witness was Dr. Billie Fairless, a Ph.D. chemist with the Environmental

Protection Agency and on leave from Indiana University. He testified as to the tests he had performed on four of the pills and concluded that the tablets did not contain any detectable amounts of LSD. Moreover, he indicated that the tests performed by the State's expert were not conclusive for LSD and could have reflected several other compounds besides LSD.

Over the objection of defense counsel, the prosecutor used a manual entitled *Basic Training Program for Forensic Drug Chemists*, published by the Federal Bureau of Narcotics and Dangerous Drugs, to cross examine this witness. While Dr. Fairless testified that he would recognize the Federal Bureau of Narcotics as authoritative with regard to some, but not all, tests concerning LSD, he neither based his testimony on any information from that Bureau nor did he recognize the manual or the names listed in the acknowledgements as authorities on the subject. The prosecutor then asked Dr. Fairless whether he agreed with short passages which the doctor read from the manual concerning the usual form in which LSD was found and the usual methods of identifying it. Fairless replied that he did not, and he further disagreed with the conclusions suggested by the prosecution in its follow-up cross-examination. The trial court had reserved its ruling on the defense's objections to the use of this manual during Dr. Fairless's testimony.

During the State's rebuttal, Lecocq, who had received part of his training from the Federal Bureau of Narcotics in Washington and who had supplied the State with the manual in question, testified that he recognized both the manual and the officials listed on the cover as being authoritative. The record does not disclose who the authors of the manual were or the role played by these officials in putting it together. The trial court then overruled the defense's objection and admitted the manual into evidence. The book itself was ordered excluded from the jury. In his final arguments, the prosecutor again referred to the manual, contrasting the brief statements previously cited with Dr. Fairless's testimony.

■■ At the outset, a question has been raised by the appellant concerning the validity of the statute under which he was convicted. Before proceeding to the merits, we must look at the State's contention that consideration of the constitutional question has been waived because, in the State's view, the defendant's references to these issues at the instruction conference and in the post-trial motion were insufficient to preserve them on appeal. We cannot agree. The question of the constitutionality of a statute is properly presented for review when it has been raised in and passed on by the trial court. (*People v. Oliger*, 32 Ill. App. 3d 889, 336 N.E.2d 769; *People v. Amerman*, 50 Ill. 2d 196, 279 N.E.2d 353.) In the case at bar, the validity of the statute was raised in the

post-trial motion and was specifically passed upon by the trial court. This is sufficient to preserve the issue for review.

The appellant argues that the classification of offenses under the Controlled Substances Act according to the weight of the "substance containing" the controlled drug bears no reasonable relationship to the purpose of the statute and thus violates both the equal protection clause and the due process clause of the Fourteenth Amendment to the United States Constitution. The thrust of this position focuses on the legislative intent to penalize "illicit traffickers" in a drug more heavily than the "occasional petty distributor." (Ill. Rev. Stat., 1973, ch. 56½, par. 1100.) The appellant maintains that by tying the seriousness of the offense to the weight of the substance containing the controlled substance, it is theoretically possible that a petty distributor who sells 30 grams of a substance, only 1 percent of which is LSD, will be subjected to a greater penalty than the trafficker who sells 29 grams of pure LSD. According to the appellant, this not only represents unequal treatment of those who have committed similar offenses but it also reflects an irrebuttable presumption in violation of the due process clause, that one who delivers a substance weighing more than 30 grams is a trafficker, regardless of the concentration of LSD.

■■ However, in accordance with the recent Illinois Supreme Court case of *People v. Mayberry*, 63 Ill. 2d 1, 345 N.E.2d 97, which considered virtually the same issues presented by this case, we must agree that the classification scheme of the Controlled Substances Act is not unconstitutional merely because it is based on the amount of substance containing the controlled substance rather than upon the amount of pure controlled substance. Using reasoning similar to the United States Court of Appeals in *United States ex rel. Daneff v. Henderson*, 501 F.2d 1180 (2d Cir. 1974) which was cited with approval, the court in *Mayberry* noted that dangerous drugs are generally marketed in a diluted state. Therefore

" * * * it was not unreasonable or irrational for a legislature to deal with the mixture or compound rather than the pure drug. * * * Our legislature may have believed that any given amount of drug can be distributed to a greater number of people and thus have a greater potential to be harmful if it is mixed with another substance. While the soundness of that belief may be questionable, the determination is one for the legislature to make, and we cannot find that the classification schemes at issue have no reasonable basis." (*People v. Mayberry*, 63 Ill. 2d 1, 9.)

As pointed out by the appellee in this case, the intention to punish petty distributors less severely than traffickers is only one of the several

objectives expressed in the Controlled Substances Act (Ill. Rev. Stat. 1973, ch. 56½, par. 1100). Other objectives include the intention to limit the access of the general population to such substances and to deter drug abuse. In light of these purposes, the conclusion of the legislature that "greater quantities present a greater threat to society * * * cannot be treated as irrational." (*United States ex rel. Daneff v. Henderson*, 501 F.2d 1180, 1184 (2d Cir. 1974).) The treatment of one who is convicted of delivery of a certain amount of a substance containing a controlled substance is not, therefore, based upon an irrebuttable presumption that the person convicted is a trafficker, but upon the legislature's reasonable perception of the threat to society in delivery of a large quantity of that substance by any person.

The defendant urges that since a "fundamental" right to be free from excessive imprisonment is involved, the "strict scrutiny" test should be used in this case to determine whether the classification scheme used in the Controlled Substances Act complies with the requirements of the Fourteenth Amendment. This test would necessitate an additional showing of a compelling State interest and no reasonable alternative for accomplishing the State's objective in order to find the statute valid. However, in both the *Mayberry* and *Daneff* cases, which presented almost identical fact situations to the case at bar, with the same rights involved, the courts held that to satisfy both clauses of the Fourteenth Amendment it was only necessary to ascertain whether there was a rational basis for the classifications drawn by the legislature. *People v. Mayberry; United States ex rel. Daneff v. Henderson.*

> "[W]e presume that the classification is valid and place the burden of showing invalidity upon the party challenging the classification. A classification scheme will be upheld if any state of facts may reasonably be conceived which would justify the classification." *People v. Mayberry*, 63 Ill. 2d 1, 9.

■■ We turn now to appellant's contention that the trial court committed reversible error in allowing the State to use a training manual published by the Federal Bureau of Narcotics and Dangerous Drugs to cross-examine the defense's expert. The State maintains that its use of the manual falls squarely within the rule of *Darling v. Charleston Community Memorial Hospital*, 33 Ill. 2d 326, 211 N.E.2d 253. *Darling* is perhaps the leading case which established the rule allowing cross-examination of expert witnesses by the use of so-called "learned treatises" whose authority has been established by some acceptable means, not limited to those situations in which the witness himself has relied on the work or recognized the competence of the authors.

> "In our opinion expert testimony will be a more effective tool in the attainment of justice if cross-examination is permitted as to views

of recognized authorities, expressed in treatises or periodicals written for professional colleagues. * * * The author's competence is established if the judge takes judicial notice of it, or if it is established by a witness expert in the subject." (*Darling v. Charleston Community Memorial Hospital*, 33 Ill. 2d 326, 336.)

The principal issue is whether the manual in question qualifies as a learned treatise whose authoritative nature was established, thus bringing it within the *Darling* rule.

The use of learned treatises on cross-examination represents a partial recognition of the learned treatise exception to the hearsay rule, as set forth in 6 Wigmore, Evidence §§1690-1700 (Chadbourn rev. ed. 1976). Wigmore emphasizes the two basic principles upon which this exception to the hearsay rule is founded—necessity, reflecting the difficulties and expense involved in obtaining expert testimony, and "a fair probability of trustworthiness." (Wigmore, at §§1691-92.) The requirement of a probability of trustworthiness goes right to the heart of the hearsay rule. (Wigmore, at §1240.) In examining the circumstances attending the publication of treatises which would be regarded as a sufficient indication of their reliability, it has been stressed that such documents are generally not written with a view to litigation or the interests of a litigable affair and that the authors of such works publish primarily for their profession and are thus subjected to critical scrutiny. Wigmore, at §1692.

A somewhat different situation is presented in this case. Although the record does not disclose the nature of the Federal Bureau of Narcotics and Dangerous Drugs, which published the manual in question, we take judicial notice of the fact that it was an agency of the United States Government, established in the Justice Department.[1] (*Reorganization Plan No. 1 of 1968*, 33 F.R. 5611, 82 Stat. 1367, 28 U.S.C.A. 509 (1976 Supp.)) An appellate court may take judicial notice of any matter of which a trial court may take judicial notice. (*Wheeler v. Aetna Casualty & Surety Co.*, 11 Ill. App. 3d 841, 298 N.E.2d 329.) Illinois courts may take judicial notice of the laws of sister States and of the United States. *Atwood Vacuum Machine Co. v. Continental Casualty Co.*, 107 Ill. App. 2d 248, 246 N.E.2d 882; Ill. Rev. Stat. 1967, ch. 51, par. 48g.

The purpose of the Federal Bureau of Narcotics as set forth in the Reorganization Plan and the President's Message accompanying it was to carry out Federal investigations and enforcement of narcotic laws. Its position in the Justice Department was geared towards a unified law enforcement effort in the control of drugs. The Bureau's director was appointed by the Attorney General. (*Reorganization Plan No. 1 of 1968*,

---

[1] The Federal Bureau of Narcotics and Dangerous Drugs has been replaced by the Drug Enforcement Administration, a single comprehensive agency "to lead the war on illicit drug traffic." 87 Stat. 1091 (1973), as amended §1, 88 Stat. 50 (1974), 28 U.S.C.A. 509 (1976 Supp.).

33 F.R. 5611, 82 Stat. 1367, 28 U.S.C.A. 509 (1968).) On the face of it, these facts suggest that the *Basic Training Program for Forensic Drug Chemists* was written with a view towards litigation involving the prosecution of defendants accused of drug related crimes. Furthermore, the record discloses no indication that this manual was "written for professional colleagues" as contemplated by *Darling v. Charleston Community Memorial Hospital*, and thus subject to the scrutiny of other professional chemists. Indeed, the manual contains the following printed restriction:

> "Caution: This document is for the confidential use of authorized law enforcement officers and officials"

and the prefatory remarks of the Bureau director indicate that the manual is intended to be used for training of new personnel in the shortest time possible. While the circumstances attending the publication of this manual may not require the conclusion that such a document lacks objectivity, yet these circumstances run contrary to the usual indicators for establishing a probability of trustworthiness and suggest that trustworthiness must be established in some other manner. We cannot subscribe to the State's suggestion that publications of governmental agencies should not be subject to the same requirements as other publications in this regard.

The issues of the author's competence and the authoritativeness of the treatise are closely bound up with the question of reliability. As pointed out before, the record in this case does not disclose who the authors of the manuals are, nor the role of those who were listed in the manual's acknowledgements. On this point we again refer to VI Wigmore, Evidence §§1693-1694, where it is stated that one of the primary factors bearing on the reliability and accuracy of learned treatises is the reputation and qualification of the author within his particular profession. Thus, as stated in section 1694:

> "The treatise writer must, like every other witness, be shown beforehand to be properly *qualified* to make statements upon the subject in hand. This will require, unless judicial notice is appropriate * * * another witness who will testify to these qualifications —which means here the summoning of anyone in the profession, art, or trade of the writer and ascertaining from him the writer's standing as an authority. This removes the danger of an ignorant use of statements by writers of no standing; but it is merely the application of the general principle as to testimonial qualification. * * * ." (Footnotes omitted.)

The manual which was used in this case had no such author whose qualifications or reputation could be assessed in determining the relative value of the writing. Under these circumstances we feel that the use of the manual was improper.

As previously noted, the defense's expert did not recognize either the text or the names listed in the manual's acknowledgements as authoritative. We agree with the Washington case of *Dabroe v. Rhodes* (1964), 64 Wash. 2d 431, 392 P.2d 317, where the court held that absent such a concession by the witness "the burden of proving that the text or treatise is authoritative should be upon the cross-examiner." (*Dabroe v. Rhodes* (1964), 64 Wash. 2d 431, 392 P.2d 317, 321-22.) In our opinion, the State did not meet its burden when it attempted to establish the authoritative nature of the manual by means of the testimony of LeCocq, a criminalist employed by the State of Illinois who received a good portion of his training from the Federal Bureau of Narcotics and Dangerous Drugs. He did not have a personal knowledge of the qualifications of those names listed in the acknowledgements and based his opinion concerning the competence of the authors on the procedures he thought were followed by the Bureau prior to publication. As pointed out by the Missouri Court of Appeals after a review of the various judicially recognized methods for establishing the authoritativeness of an article or treatise, where the trial court has not taken judicial notice of its status and the witness being cross-examined has not conceded this point, the cross-examiner must "prove authoritativeness of the article or treatise by an *independent* expert." (*Kansas City v. Dugan,* 524 S.W.2d 194 (Mo. App. 1975).) (Emphasis added.) The danger pointed out by Justice Black of the Michigan Supreme Court in his criticism of that court's failure to give guidelines for establishing authoritativeness, is that this kind of evidence is "apt to impress the unwary by the mere fact of its having been printed and published somewhere." *Jones v. Bloom* (1972), 388 Mich. 98, 200 N.W.2d 196 (dissent).

For the foregoing reasons, we find that the training manual used by the State to cross-examine Dr. Fairless was not established as a learned treatise and its authoritative nature was not proved. It was therefore error to permit its use.

The conviction of the defendant depended entirely on the disputed question of fact as to whether the substance involved was LSD, this being the only issue at trial. It is therefore difficult to conclude that the error committed by the State in its use of the manual during the trial was harmless.

For the foregoing reasons the judgment of the circuit court of Williamson County is reversed and this case is remanded for a new trial.

Reversed and remanded.

KARNS, P. J., concurs.

Mr. JUSTICE JONES, dissenting:

The majority opinion has concluded that it was reversible error to allow the prosecutor to cross-examine witness Fairless through references to the manual entitled *Basic Training Program for Forensic Drug Chemists.* In my opinion the use of this manual for cross-examination was entirely proper and I therefore respectfully dissent.

The premise upon which the conclusion of the majority opinion rests is that the authoritative nature of this manual as a learned treatise was not established in the trial court. As this premise falls, so does the conclusion which is based upon it.

The majority opinion correctly points out that the leading case in Illinois on the subject of the cross-examination of expert witnesses through the use of learned treatises is *Darling v. Charleston Community Memorial Hospital,* 33 Ill. 2d 326, 211 N.E.2d 253. In that case the Supreme Court stated:

"An individual becomes an expert by studying and absorbing a body of knowledge. To prevent cross-examination upon the relevant body of knowledge serves only to protect the ignorant or unscrupulous expert witness. In our opinion expert testimony will be a more effective tool in the attainment of justice if cross-examination is permitted as to the views of recognized authorities, expressed in treatises or periodicals written for professional colleagues. [Citation.] *The author's competence is established if the judge takes judicial notice of it, or if it is established by a witness expert in the subject.*" (Emphasis added.) 33 Ill. 2d 326, 336, 211 N.E.2d 253, 259.

As the emphasized portion of this quotation clearly indicates, in this State there are two acceptable methods of establishing a treatise as a proper subject for use on cross-examination of an expert witness. The treatise can properly be used if the trial court takes judicial notice of its authoritativeness in the field or if the party seeking to use it produces an expert witness who testifies that the work has been prepared by an authority in the field.

The manual in question was prepared by the Federal Bureau of Narcotics and Dangerous Drugs. On the title page of the manual appear the names of John W. Gunn, Jr., the Chief of the Bureau, and Roger Kenneth. Obviously, the fact that their names appear there means that the manual was written for the Bureau of Narcotics either by them or under their direction, supervision, or authority, or with their approval. Daniel Lecocq, the supervising criminalist for the Illinois Bureau of Identification, who testified as an expert witness for the State in the instant case, stated that he recognized Gunn and Kenneth as authorities in the

field of LSD analysis. It can hardly be more clear that Lecocq's testimony brought the manual squarely within the *Darling* rule.

The expert witness testifying for defendant in the instant case, cross-examined through the use of this manual, was Billie Fairless. Mr. Fairless made it clear that his field of expertise was environmental pollution, not narcotics or dangerous drugs. He admitted on cross-examination that he was, at the time of the trial, on leave from the Federal Environmental Protection Agency and that his duties with that agency mainly involved the analysis of "[g]ases and sewage and soil pollution." Although Fairless stated that he was not familiar with John W. Gunn, Jr. or Roger Kenneth, he agreed that the Federal Bureau of Narcotics and Dangerous Drugs is an authority with respect to LSD analysis.

Considering Mr. Fairless' field of expertise, it is understandable that he would not be familiar with Gunn or Kenneth. But Fairless' lack of familiarity with those two men in no way detracts from the identification of Gunn and Kenneth by Lecocq, the State's expert witness, as authorities in the field.

The majority opinion concludes that because the purpose of the Federal Bureau of Narcotics was to carry out Federal investigations and enforcement of narcotics laws, the manual in question "was written with a view towards litigation involving the prosecution of defendants accused of drug related crimes." The majority opinion then states that "the record discloses no indication that this manual was 'written for professional colleagues' as contemplated by *Darling* * * *" and points out that the manual contains a printed restriction which indicates that the manual is for the confidential use of law enforcement personnel. In the opinion of the majority these factors indicate that the manual lacks the trustworthiness necessary for its use on cross-examination as a learned treatise. The premise of the majority that the manual was "written with a view toward litigation involving prosecution * * *" is not well taken. It would be equally correct to say that the manual was written with a view toward preventing litigation for the processes described will disclose innocuous substances as well as narcotics and dangerous drugs.

Obviously, because the manual in question deals with the chemistry of narcotics and dangerous drugs, such as LSD, it should not be distributed to the public in general or to all chemists in general. The government certainly has a legitimate interest in controlling the dissemination of the type of information appearing in the manual. But the limited distribution of the book does not detract from its trustworthiness. It is sufficiently authoritative to serve as a guide for forensic chemists in the performance of laboratory tests and chemical analysis to determine the presence of dangerous drugs in suspect substances. The tests are necessarily neutral,

dependent upon chemical and physical reactions when suspect substances are submitted to analysis. The very processes involved, that is, chemical and physical interaction, lend credence to the notice that the manual is necessarily authoritative. The interplay of chemicals when combined or subjected to physical tests can be "authored" only by laws of nature. Chemists can but collate test results. That is essentially the makeup of the manual in question.

Furthermore, the mere fact that the purpose of the Federal Bureau of Narcotics was to carry out Federal investigations and enforcement of narcotics laws does not support the conclusion that this manual was written with a "view towards a litigation" in the sense that the phrase is contemplated by VI Wigmore on Evidence §1692. The manual was written for the purpose of analyzing drugs to determine if they are illicit drugs. The fact that some person or persons may be arrested or prosecuted because of the analyses outlined in the manual is only indirectly related to the purpose for which the manual was written. In my opinion, this manual can no more be considered as written with a "view to a litigation" than could, for example, an authoritative text on the medical treatment of common industrial injuries. Such a text would, no doubt, often be referred to in litigation arising from industrial injuries; but it can hardly be said that the purpose of the text is anything other than medical treatment.

As Wigmore explains, the ordinary requirement of trustworthiness, which is necessary for an exception to the hearsay rule to be recognized, is fulfilled when the declarant has no "motive to misrepresent." (VI Wigmore on Evidence §1692.) I am not willing to ascribe to the Federal Bureau of Narcotics a "motive to misrepresent" in the publication of the manual in question. It is only through such an ascription that the majority opinion has reached the conclusion that it has.

As the *Darling* opinion points out, "[t]o prevent cross-examination upon the relevant body of knowledge serves only to protect the ignorant or unscrupulous expert witness." (33 Ill. 2d 326, 336, 211 N.E.2d 253, 259.) In my opinion, refusing to let an expert witness testifying in a case involving illicit drugs, whose field of expertise is environmental pollution, to be cross-examined through the use of the manual in question can only serve to afford the type of protection which *Darling* is aimed at removing.

I would affirm.