161 Ill. App.3d 565 (1987)
515 N.E.2d 208
In re ESTATE OF JAMES DICKENS, a Minor, Deceased (Luther Dickens, Special Adm'r, Plaintiff-Appellant,
v.
Avanti Research & Development, Inc., Defendant-Appellee).
No. 85-2406.
Illinois Appellate Court  First District (5th Division).
Opinion filed September 18, 1987.
Rehearing denied October 19, 1987.
*566 French, Rogers, Kezelis & Kominiarek, P.C., of Chicago (Richard G. French and Russell P. Veldenz, of counsel), for appellant.
Ronald S. Fishman, of Chicago, for appellee.
Judgment affirmed.
JUSTICE LORENZ delivered the opinion of the court:
This lawsuit arises out of an electrocution accident involving an antenna and a power line. Plaintiff appeals from a jury verdict and the denial of his post-trial motion, and on appeal he urges the following: (1) it was improper for the trial court to grant defendant's motion in limine excluding reference to any similar accidents concerning antennas; (2) the trial court erred when it excluded all references *567 to the existence of or adequacy of warnings or instructions pertaining to this product; (3) the trial court erred in sustaining defendant's objections to plaintiff's cross-examination of defendant's expert witness and president on the issue of the feasibility of making the antenna safer; and (4) the trial court erred when it prevented plaintiff's expert witness from supporting his opinion by reference to authoritative data or treatises.
We affirm.
The following facts are pertinent to our disposition of this cause. On February 23, 1980, there was an electrocution accident with an antenna and a power line. Defendant manufactured the antenna known as an AV 170. This base station antenna was approximately 20 feet long. Near the base of the antenna are four horizontal radials which create an electrical ground plane extending three feet in all directions. It also has a solid piece of rubber near the base of the antenna.
Eric Enzenbacher, age 15, purchased the AV 170 antenna and a "CB" radio from a third party. The radio did not come in a box. The seller did not give any instruction manuals to Enzenbacher. He then showed Enzenbacher a disassembled antenna in a cardboard box. Enzenbacher testified at trial that the antenna was new because the cardboard box was taped shut; however, in a deposition four years earlier he had testified that the antenna was not in its original package. Instead, the seller placed it in the same type of cardboard box. It is undisputed that the box did not contain any instruction manuals or warnings. Enzenbacher and a friend installed the antenna on top of his house.
On the day before the accident, Enzenbacher and the decedent, James Dickens, removed the antenna from Enzenbacher's roof. He intended to lend the radio and the antenna to Dickens. The antenna had been previously inserted into a galvanized pipe which came from Enzenbacher's yard. After removing the antenna from the roof, the two boys removed the radials and taped them to the antenna. They carried the antenna over to Dickens' house. They intended to erect the antenna near the window of the Dickens' garage. At the rear of the property there are high tension wires which run parallel to the property. The wires are located at the top of a 20-foot utility pole and carry approximately 7,000 volts. The lower and more visible wires are telephone cables. Enzenbacher testified that he did not think the antenna could reach the power lines. The boys waited until the next day to install the antenna.
Enzenbacher described the day as "wet." It took them approximately *568 one hour to clear the area of erection, attach the coaxial cable, and set the ground pipe into the position. They found a two-foot ground pipe which was going to hold the mast. They also placed an aluminum ladder against the side of the garage. The boys intended to use the ladder to place a bracket at the top of the garage to hold the mast. They placed the ladder approximately 10 feet away from the pipe because they did not want the ladder to become tangled up with the mast as they were lifting the antenna. They tried to walk the antenna over the ground pipe, gradually raising the antenna to a 90° angle. Once the antenna was near to the ground pipe they started to lift the antenna up to insert it into the pipe. The tip of the antenna then bent over as if it were pulled downward. It hit the electrical wire. Enzenbacher broke free. Dickens, however, fell to the ground near the antenna. The base of the antenna apparently burnt through his clothing. He died as the result of his injuries.
Both plaintiff's original and amended complaints were based on a strict liability theory. Plaintiff alleged that the defendant manufactured, designed and produced a C.B. base station antenna which was dangerous to the user or installer. The complaint further alleged that the antenna failed to contain proper or adequate warnings to the installer to watch for electrical lines; that it was reasonably foreseeable that during installation the antenna would fall or come into contact with electrical lines; and that the antenna was hazardous because the defendant failed to coat it with plastic or other insulating material.
An amendment to the amended complaint alleged that the antenna contained a segment in the shaft which appeared to be an insulator or protective device, particularly to a minor. The antenna failed to contain proper warnings or instructions that it was unsafe for two persons to attempt to raise the antenna without the use of restraining devices. It failed to contain proper warnings or instructions as to the proper procedure necessary to raise a 20-foot metal antenna, particularly when attached to a metal mast of similar length. The amendment also contained copies of the type of warnings which allegedly should have been attached to the antenna.
The trial of this cause began on April 2, 1985. On April 3, 1985, defendant filed a motion in limine. Defendant requested an order prohibiting the plaintiff from referring to, commenting on or interrogating any witness or presenting any evidence on the alleged failure of the AV 170 antenna to contain proper or adequate warnings concerning the dangers of electrocution. Defendant also sought to exclude the existence of any other claims, lawsuits, or actions against defendant or other companies which involved C.B. antennas and electrocution. *569 Plaintiff responded. After argument and an evidentiary hearing, the trial judge granted defendant's motion.
Ralph Armington, an expert retained by the plaintiff, testified as to the general characteristics of electricity, its potential for harm, the elements of a circuit and the scientific principles of insulation and ground. He stated that voltage as low as 120 volts is sufficient to cause injury or death. At this point, plaintiff made an offer of proof, through this expert, that if a product is involved in a multitude of accidents, it indicates that the product is unreasonably dangerous because it does not have devices to prevent accidents or has not been supplied with an adequate warning. As to warnings, he testified during the offer of proof that they were very easy to include and the accident may not have occurred but for the absence of warnings. The trial court barred introduction of this evidence.
After the offer of proof, Armington testified that it was foreseeable that an antenna of this length would come in contact with high voltage power lines. At this juncture Armington attempted to testify concerning other incidents known to him and, again, the court ruled that other accidents were not relevant.
Armington recommended either coating the entire antenna with insulating material sufficient to withstand 7,000 volts or a plug of insulating material which separated the antenna into two halves. The second method would require two capacitors, which would allow high frequencies to pass through the antenna but not lower frequencies, which a power line passes. In his opinion, these recommendations would not affect the function of the antenna and were feasible alternatives from 1975 through 1980. In fact, one of defendant's competitors manufactured a base station C.B. antenna with a plastic and fiberglass coating. In Armington's opinion it was highly probable that this other antenna would prevent any dangerous current from flowing down to a user.
Defendant then presented witnesses who testified that the AV 170 antenna was reasonably safe. Furthermore, defendant had previously attempted to insulate the AV 170; however, the experiments were unsuccessful. Following closing argument, the jury returned a verdict of not guilty and the trial judge entered judgment in favor of defendant. The trial judge also denied plaintiff's post-trial motion.

OPINION
 1 Initially it is contended that the trial court erred in excluding any reference to prior or subsequent similar accidents involving C.B. antennas. In support plaintiff relies exclusively on the well-settled *570 principle that evidence of prior similar occurrences is admissible for the purpose of demonstrating that a manufacturer possessed knowledge of a defect in a particular product prior to the accident in the litigated case. (Holmes v. Sahara Coal Co. (1985), 131 Ill. App.3d 666, 475 N.E.2d 1383.) However, plaintiff fails to recognize that where a situation speaks for itself evidence of other accidents is unnecessary and inadmissible. (McCormick, Evidence sec. 200, at 475 (2d ed. 1972).) The danger of electrocution by touching electrical wires is common knowledge to all persons of ordinary intelligence and experience. (Genaust v. Illinois Power Co. (1976), 62 Ill.2d 456, 343 N.E.2d 465.) Evidence of other electrocutions was irrelevant and the suggestion that such evidence should have been allowed is tantamount to requiring warnings of open and obvious danger.
 2, 3 In a related contention plaintiff asserts that the trial court erred in excluding all reference to warnings or instructions that defendant had failed to attach to the antenna. Plaintiff bases this argument on a faulty premise: that the defendant had a duty to warn of the danger of possible electrocution. Generally, a duty to warn exists where there is unequal knowledge between the manufacturer and user. (Fuller v. Fend-All Co. (1979), 70 Ill. App.3d 634, 388 N.E.2d 964.) When the danger is obvious there is no need to warn because the user had equal knowledge. (Baylie v. Swift & Co. (1975), 27 Ill. App.3d 1031, 327 N.E.2d 438.) The determination of whether a duty to warn exists is a question of law and not of fact. Genaust v. Illinois Power Co. (1976), 62 Ill.2d 456, 343 N.E.2d 465.
 4 Here, we find as a matter of law that no duty to warn existed. It is therefore axiomatic that if defendant had no duty to warn, evidence that he failed to warn would be irrelevant and highly prejudicial. In Genaust a galvanized steel C.B. antenna and tower which plaintiff was installing came in close proximity to overhead, uninsulated power wires located close to the boundary of plaintiff's property. Electric current arced from the overhead power lines through the antenna, severely injuring plaintiff. The Illinois Supreme Court affirmed the dismissal of the strict liability count, holding that the danger of electrocution by touching or arcing electrical wires is common knowledge to all persons of ordinary intelligence and experience, and, accordingly, there is no duty to warn an invitee on one's property that such danger exists.
Plaintiff attempts to distinguish the facts at bar from Genaust by stating that it is an "absurd proposition" that the danger was open and obvious considering the fact that these were 14-year-old boys working some 40 feet away from wires, which were about 20 feet in *571 the air, on telephone poles, in a forested area and which were virtually invisible from the ground. This contention misrepresents the record; it also does not convincingly distinguish this case from Genaust.
The decedent's degree of experience or expertise as an electrician is not determinative. (Carrol v. Commonwealth Edison Co. (1986), 147 Ill. App.3d 909, 498 N.E.2d 645.) In Holecek v. E-Z Just (1984), 124 Ill. App.3d 251, 464 N.E.2d 696, the plaintiff was a welder. He sought to distinguish Genaust on the ground that the plaintiff in Genaust was an experienced electrical contractor. We rejected the plaintiff's argument in Holecek, finding that Genaust is not limited to plaintiffs who are knowledgeable in electrical work, but clearly applies to all persons of "ordinary intelligence and experience." (See Carrol v. Commonwealth Edison Co. (1986), 147 Ill. App.3d 909, 498 N.E.2d 645.) Furthermore, the evidence demonstrates that the two boys had actual knowledge. Enzenbacher had done reading on the subject of C.B. radios at the library. He also testified that he and Dickens did not believe the antenna could hit the power line, thus acknowledging they were aware of the danger.
Additionally, plaintiff's argument that the high tension power lines were hard to see because they were in a forested area is simply a misrepresentation of the record. As the pictures which were admitted into evidence illustrate, the power lines were not in a forested area but rather were on the decedent's property, which is bordered by trees. As previously stated, Enzenbacher testified that he saw the wires but said that he and decedent did not believe the antenna could hit the lines. Clearly any warning to avoid hitting the power lines would have been superfluous. We conclude that Genaust is controlling, and because the knowledge of the danger of electrical energy is imputed to decedent, defendant had no duty to warn of a condition which was or should have been known and obvious to him. Consequently, the trial court properly excluded all references to defendant's failure to warn.
 5 Plaintiff next contends that his cross-examination of defendant's expert, Max Adams, and defendant's president, Michael Feldman, was severely restricted by the trial court's rulings, which not only prevented plaintiff from cross-examining either on the issue of warnings or similar accidents, but also prevented plaintiff from cross-examining these witnesses on the issue of the feasibility of making the product safer. As previously discussed, the exclusion of references to warnings or similar accidents was proper. Thus the only issue deserving of discussion is whether plaintiff was precluded from cross-examining these witnesses concerning the feasibility of making the antenna *572 safer.
 6 Plaintiff states that Adams rendered an opinion that the metal antenna was not hazardous and it was not feasible to insulate or otherwise guard the antenna so as to make it more safe in the event of contact with electrical lines. Adams based this opinion upon the proposition that even if insulated, conductive pollutants could build up on the outside of the antenna, thereby rendering the insulation ineffective. Plaintiff states that "[h]is [Adams'] opinion was not supported by any research or tests, nor did he rely upon any authoritative treatises or scientific data." This, again, is a misrepresentation of the record. Adams stated that he "ran mechanical testing" on insulated antennas, but did not test the antenna's performance. Adams was cross-examined concerning the basis of his conclusions and the reports he reviewed prior to reaching this opinion. However, counsel was not allowed to bring out the substance of these reports because Adams did not consider them authoritative on the issue of insulation. Moreover, these reports constituted inadmissible hearsay because he did not prepare the reports. In order to use a treatise to cross-examine an expert witness, it is required that the writer be shown to be properly qualified to make the statements on the subject unless the witness acknowledges the material to be authoritative. (People v. Behnke (1976), 41 Ill. App.3d 276, 353 N.E.2d 684.) Here, neither of those conditions were met and the substance of those reports was, therefore, properly excluded by the trial court.
 7 Plaintiff also contends that he was deprived of effective cross-examination of Feldman. Plaintiff states that "Feldman was permitted to testify, (falsely), that [defendant's] competitors * * * had not and could not insulate their metal antennas." Again, plaintiff seriously misrepresents the record. Feldman, in fact, testified that one of Avanti's competitors did claim to manufacture an antenna with fiberglass or insulating valve. Further, plaintiff's reference to Feldman as defendant's expert is misleading. Feldman testified as an adverse witness called by plaintiff pursuant to the Code of Civil Procedure. (Ill. Rev. Stat. 1985, ch. 110, par. 2-1102.) In addition, the reports that plaintiff attempted to have admitted were inadmissible hearsay, as previously stated. See People v. Behnke (1976), 41 Ill. App.3d 276, 353 N.E.2d 684.
 8 Plaintiff also contends that his expert, Professor Armington, should have been allowed to refer to various data and treatises either in supporting his testimony or in rebuttal. Contrary to plaintiff's assertions, Armington testified he did not review or rely on any tests, articles, treatises, publications or government bulletins in arriving at *573 his opinions. Armington testified that it was foreseeable that a 21-foot antenna attached to a 20-foot galvanized steel mast would come into contact with an overhead high tension power line. He also testified that insulation of a sufficient thickness would have prevented electrocution in the instant case. The authoritative material plaintiff wished to have admitted supported these opinions. However, it is well settled that a scientific treatise is hearsay and is inadmissible as proof of the statements it contained. (Walski v. Tiesenga (1978), 72 Ill.2d 249, 381 N.E.2d 279.) As such, the trial court properly excluded reference to those materials.
 9 Plaintiff's final contention is that defense counsel was permitted to argue that the decedent should have referred to the instructions and had misused the product. Plaintiff, however, has failed to include a transcript of this argument in the record on appeal. The burden is on appellant to bring to the appellate court a record which will establish reversible error. (In re Estate of Medina (1968), 95 Ill. App.2d 483, 238 N.E.2d 185.) Consequently, we cannot review this final contention.
For the above reasons the judgment of the trial court is affirmed.
Affirmed.
SULLIVAN, P.J., and MURRAY, J., concur.