RAVENIS v DETROIT GENERAL HOSPITAL

1. MASTER AND SERVANT—RESPONDEAT SUPERIOR—NEGLIGENCE—NEG-
   LIGENCE OF MASTER.

   No liability may be imposed on the master, under the doctrine of
   *respondeat superior,* if the servant was not negligent; however,
   recovery in a negligence action is not limited to this doctrine
   where negligence on the part of the master is specifically
   alleged in the complaint.

2. NEGLIGENCE—CORNEA TRANSPLANTS—HOSPITALS—PROCEDURES—
   MEDICAL FILES—ACCESS—JURY—EXPERT TESTIMONY.

   A jury could properly conclude that a hospital was negligent in
   failing to set up a procedure which would assure that the
   person responsible for determining the suitability of a cornea
   for transplant would have access to all of the relevant medical
   records of the proposed donor where it heard expert testimony
   that cadavers with a history of certain illnesses were not wise
   choices for cornea donors, and testimony that portions of the
   donor's complete medical file which would have revealed dis-
   eases in the proscribed categories were not made available to
   the doctor determining suitability.

3. WITNESSES—EXPERT WITNESSES—CROSS-EXAMINATION—TEXTBOOKS
   —AUTHORITATIVENESS.

   Medical textbooks or other publications may be used to cross-
   examine expert witnesses if the expert recognizes the publica-
   tion as authoritative, or if the trial court takes judicial notice
   of the publication as authoritative; judicial notice of a publica-

REFERENCES FOR POINTS IN HEADNOTES
[1] 53 Am Jur 2d, Master and Servant §§ 442, 454.
   Necessity of pleading that tort was committed by servant, in action
      against master. 4 ALR2d 292.
[2] 40 Am Jur 2d, Hospitals § 43.
   61 Am Jur 2d, Physicians and Surgeons § 129.
[3] 31 Am Jur 2d, Expert and Opinion Evidence §§ 66–68.
   Use of medical or other scientific treatises in cross-examination of
      expert witnesses. 60 ALR2d 77.
[4] 22 Am Jur 2d, Damages §§ 274, 276.

tion as authoritative may be based on the testimony of other experts in the field.

4. DAMAGES—AD DAMNUM CLAUSES—PROVABLE DAMAGES—COURTS— AUTHORITY.

A trial court has the authority to award a greater amount of actual damages than a plaintiff had requested in her *ad damnum* clause, even though there was no motion to amend this clause; a plaintiff may recover a judgment in the amount of provable damages irrespective of the *ad damnum* clause (GCR 1963, 518.3).

Appeal from Wayne, Peter B. Spivak, J. Submitted May 7, 1975, at Detroit. (Docket Nos. 17851, 17852.) Decided August 11, 1975. Leave to appeal denied, 395 Mich —.

Complaints by Charles Ravenis and Louella Bradford against Detroit General Hospital, Harper Hospital, Oscar Brown and Leonard Sachs for damages for medical malpractice. Judgments for plaintiffs. Defendants Detroit General Hospital and Harper Hospital appeal. Affirmed.

*Charfoos & Charfoos, P. C.,* for plaintiffs.

*Robert Reese,* Corporation Counsel, and *Kenneth H. Phillips, Gregory E. Snow* and *Dean Koulouras,* Assistants Corporation Counsel, for defendants.

Before: V. J. BRENNAN, P. J., and McGREGOR and D. F. WALSH, JJ.

D. F. WALSH, J. This is a consolidated medical malpractice action wherein defendant Detroit General Hospital was found by a jury to be negligent in the method of its selection of an eye donor for two corneal transplants.

The plaintiffs, Louella Bradford and Charles Ravenis, instituted proceedings which eventually named as defendants not only Detroit General but

also Harper Hospital, Oscar Brown, M.D., and Leonard Sachs, M.D. Their claims were based on corneal transplants performed by Dr. Brown at Harper Hospital on March 16, 1970. A deceased patient at Detroit General, Art Robertson, was the donor of both eyes, which had been removed by defendant Leonard Sachs, M.D., who was then a first year resident in ophthalmology.

Both plaintiffs' complaints allege that Detroit General was negligent in its selection of a donor since the donor was not "fit within the medical standard of care in this community to be a donor" for a cornea transplant. The thrust of defendants' argument on appeal is that since Dr. Sachs was found by the jury to be free from negligence no liability may be imposed on the principal Detroit General, citing *Lamb v Oakwood Hospital Corp,* 41 Mich App 287, 290; 200 NW2d 88 (1972). The defendant further argues that the only avenue of recovery against Detroit General was through a finding of improper selection of a donor or inadequate supervision of Dr. Sachs; and since there was no expert testimony introduced defining what the standard of care was or that it was Detroit General's responsibility to screen prospective eye donors it was reversible error to enter judgment against Detroit General.

On or about March 13, 1970, Dr. Sachs was summoned from the eye clinic of Detroit General to go to the morgue and remove the eyes from a cadaver. There was testimony that at that time it was the practice at Detroit General for first year ophthalmology residents to remove all the donor eyes from cadavers.

Before going to the morgue Dr. Sachs went to the medical records office, picked up the deceased's chart—which had been maintained during his last admission to the hospital prior to death—and se-

cured the deceased's wife's permission to remove the eyes. Dr. Sachs' testimony was that he reviewed Mr. Robertson's chart line by line and that he saw no evidence that would contraindicate taking these corneas. The results of blood cultures and sputum cultures which had been done on the deceased shortly before death were unexplainedly missing from Mr. Robertson's file. Furthermore, charts covering the previous admissions of the deceased—going back over five years—were also missing from the file.

Dr. Sachs also testified that Detroit General had no printed or published checklist which could be used as a guideline for determining the suitability of a prospective donor. The criteria for making this determination was learned orally from senior residents. As to the screening of eye donors at Detroit General, Sachs' testimony was as follows:

"I think it is important to emphasize that in March of 1970, nobody at Detroit General Hospital, including myself had any responsibility whatsoever for determining whether the eyes would be suitable for transplantation or whether the eyes were not suitable for transplantation. It is not the purpose of the eye man at Detroit General Hospital to screen prospective donors."

On the subject of determining the acceptability of eyes to be used for cornea transplants, Dr. Sachs testified that expert examination of all layers of the cornea under a slit lamp biomicroscope was required, that several such instruments were available at Detroit General but that they were not used on cadaver corneas because "it was not our responsibility to do this. I would expect the surgeon to use it".

Oscar Brown, M.D., testified that he performed the major portion of the surgery for both plaintiffs

and that when it was brought to his attention that an infection had developed in the patients after surgery he ordered a thorough investigation to determine the source of infection. However, the inquiry showed no indication that the operations were performed other than in aseptic conditions. Neither plaintiff had any physical condition which would have caused these infections and both developed ophthalmitis (inflammation of the eye) which eventuated in the total loss of sight in each transplanted eye. It was Dr. Brown's opinion, therefore, that the source of infection was the donor.

Dr. Brown testified that in March of 1970 there existed published criteria for the acceptability of cadavers as eye donors. These standards, which were fairly uniform within the community and throughout the nation, contraindicated the use of a cadaver which had a history of any of the following conditions: (1) long term debilitating disease; (2) systemic disease; (3) acute infection; and (4) septicemia. Dr. Brown defined septicemia as "a demonstrable infection within the bloodstream".

Detroit General Hospital records which for some reason were not made available to Dr. Sachs described Mr. Robertson as a "[s]ixty year old white male, heavy alcoholic with cirrhosis of the liver proven by autopsy". Mr. Robertson's autopsy report showed the immediate cause of death to be advanced portal cirrhosis. Under the section of the autopsy report entitled "History" were listed several different diseases and conditions, among them esophageal varices (bleeding); splenomogaly (enlargement of the spleen); ascites (abnormal free fluid in the abdominal cavity); gastric ulcer, acute superficial; acute tracheal bronchitis; and a localized hemorrhage in the urinary bladder.

As a general statement of law it is, of course,

true, as defendant suggests, that no liability may be imposed on the master if the servant is not negligent. *Cf. Lamb v Oakwood Hospital Corp, supra.* But in the instant case the plaintiff's theory of recovery was not limited to *respondeat superior.* The complaint specifically alleged negligence on the part of Detroit General in its selection of the eye donor.

We further disagree with the defendant that the jury decided this case without the benefit of expert testimony tending to show the defendant violated the required standard of care. See, *e.g., Heins v Synkonis,* 58 Mich App 119, 122; 227 NW2d 247 (1975), *Lince v Monson,* 363 Mich 135, 140; 108 NW2d 845 (1961). On the contrary the jury heard expert testimony to the effect that cadavers with a history of certain types of illnesses are not generally wise choices for cornea donation. It follows that whoever may have had the responsibility of determining the suitability of the cornea for transplant would have been required, in exercise of due care, to review carefully and exhaustively the medical history of the proposed donor.

The jury also heard testimony, however, that in this case portions of the donor's complete medical file which would have revealed that the donor had been affected with several diseases falling into nearly every proscribed category were for some reason not made available to Dr. Sachs.

The jury could have determined therefore that Detroit General was negligent in failing to set up a procedure which would assure that the party responsible for determining the suitability of the cornea for transplant would have access to all of the relevant medical records of the proposed donor.

The defendant further asserts that it was error

for the trial judge to allow plaintiff's counsel to refer to a certain medical text during the cross-examination of Dr. Sachs because Dr. Sachs himself did not recognize the textbook as being authoritative.

In *Jones v Bloom,* 388 Mich 98, 118; 200 NW2d 196 (1972), our Supreme Court said:

> "We, therefore, hold that medical textbooks or other publications may be used to cross-examine expert witnesses if the expert recognized the publication as authoritative, or if the trial court takes judicial notice of the publication as authoritative. See *Darling v Charleston Community Memorial Hospital,* * * * ."[1]

The defendant argues that proper interpretation of *Jones* compels the conclusion that the use of scientific publications in cross-examination is prohibited unless the witness being cross-examined recognizes the publication as authoritative. We do not read *Jones* so restrictively. If the trial court can take judicial notice of the publication as authoritative, it can certainly make the same determination based on the testimony of other experts in the field. This is in fact the holding in *Darling v Charleston Community Memorial Hospital, supra,* quoted with approval by our Supreme Court in formulating the liberalized Michigan rule enunciated in *Jones.* In that case the Illinois court said (p 336):

> "In our opinion expert testimony will be a more effective tool in the attainment of justice if cross-examination is permitted as to the views of recognized authorities, expressed in treatises or periodicals written for professional colleagues. *(Cf.* Model Code of Evidence, Rule 529.) The author's competence is established if the

[1] *Darling v Charleston Community Memorial Hospital,* 33 Ill 2d 326; 211 NE2d 253; 14 ALR3d 860 (1965).

judge takes judicial notice of it, *or if it is established by a witness expert in the subject.* "(Emphasis ours.)

In this case Martin Lerner, M.D., a specialist in infectious disease, testified that Dr. Brown represented "a very high level of medical practice". Dr. Brown testified that he would consider the Atlas of Ophthalmic Surgery by John K. King, M.D., and Joseph Wadsworth, M.D., as a good authoritative book. When defendant's counsel objected to any reference to the *Atlas* during cross-examination of Dr. Sachs, the trial court ruled, "based upon the testimony of Dr. Brown and based upon Dr. Lerner's testimony about Dr. Brown, I will find that the book is authoritative and may be used". We find no error in this ruling.

The final issue raised by the defendant is whether the trial judge erred in entering judgment for plaintiff Bradford in an amount which exceeded the figure stated in her *ad damnum* clause where there was no motion to amend such clause after the jury verdict. We resolve this question against the defendant on the authority of *Gibeault v City of Highland Park,* 49 Mich App 736, 740–741; 212 NW2d 818 (1973), *affirmed* 391 Mich 814 (1974).

The judgment of the trial court is therefore affirmed.