STATE of Utah, Plaintiff and Respondent,

v.

Keith S. BROOKS, Defendant and Appellant.

No. 14539.

Supreme Court of Utah.

April 26, 1977.

---

Robert A. Echard, of Patterson, Foley, Phillips, Gridley & Echard, Ogden, for defendant and appellant.

Vernon B. Romney, Atty. Gen., William W. Barrett, Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

MAUGHAN, Justice:

Before us is a jury verdict convicting defendant of the crime of aggravated robbery. By appeal defendant assigns error to two judgments of the trial court, viz., failure to discharge two jurors, for cause, upon defendant's application; and denial of defendant's motion for a directed verdict.

We reverse, and remand for a new trial. All statutory references are to U.C.A. 1953.

Defendant was charged with robbing the Circle K Grocery Store, which is situated on Highway 91 in Bountiful, Utah. The crime occurred about 10:20 in the evening June 21, 1975. There were three witnesses to the crime, an employee of the store and two customers. The employee and one customer testified at the trial; no attempt was made to locate the other customer.

On appeal, defendant contends the trial court committed prejudicial error when it refused to remove two jurors for cause. As a result, he was compelled to use two of his four peremptory challenges, to remove these jurors.

There were twenty-one potential jurors present in the court, of which sixteen were called and seated. One of the sixteen was Mason Moore. The record indicates that Mr. Moore was a neighbor and personal friend of the prosecution's witness, Barry Godwin, the employee of the store and victim of the robbery. The record indicates the two men lived on the same street and attended the same ward, of the L. D. S. Church.

In pursuing the extent and depth of the relationship, defense counsel queried:

MR. ECHARD: I'd like to have Mr. Moore asked if his, just the general relationship with Mr. Godwin would affect him in trying the case at all, under any circumstances; if he feels he can be a fair and impartial jury member knowing that he may be one of the key witnesses involved in the trial.

PROSPECTIVE JUROR MOORE: It might—I might have some feelings, since I know Barry, that I'd like to see him receive whatever is due, or that justice was met. But I think the facts would have to answer that, and I would address myself to the facts.

MR. ECHARD: I wonder if we could ask Mr. Moore, Your Honor, if he were sitting as a defendant in a trial, and a witness that was testifying in that trial against him had a friend sitting on the jury with the same state of mind that Mr. Moore has, if he, as a defendant, would feel comfortable about that.

PROSPECTIVE JUROR MOORE: Probably not, but—

MR. ECHARD: I would ask that Mr. Moore be excused, Your Honor.

The other prospective juror, who was challenged for cause was Pam Ward. She described herself and her husband as being very good friends with police officer, Leishman. Furthermore, Mrs. Ward had a regular business relationship with Mr. Leishman's wife, they worked together at the same bank. Defense counsel queried whether Mrs. Ward's close relationship might affect her determination, if Mr. Leishman were a witness at the trial. She responded:

He's a very good friend, but of course I, you know, I know I would be fair. I would consider the facts.

Defense counsel challenged Mr. Moore and Mrs. Ward because of their close relationships. He stated:

MR. ECHARD: Just, Your Honor, I feel that it's not fair to them, or anyone else in the courtroom, where two people that they indicate they are close friends with are going to be called as witnesses, and where there is some dispute about the testimony between the various witnesses and the validity of it. Puts them in a position where they have to decide something, and I don't think it's fair to the defendant to have someone sitting in that position that could possibly be influenced. Although I'm sure they would not intentionally let it bother them, subconsciously I think it may. I think he's entitled to as fair and impartial hearing as he can get.

THE COURT: The jury system ladies and gentlemen, was invented in an atmosphere and a situation so that parties could be tried by a jury of their peers. And in most communities the parties are known to the jurors and the jurors know something about the parties. I think it would be almost impossible, in some of our rural counties, to choose a jury who did not know witnesses and did not know the parties or something about the parties. Those acquaintanceships do not disqualify a person to serve as a juror in a case. Those relationships could, however, result in disqualification. But that would be if, because of those relationships, a juror would have difficulty setting those relationships aside and trying the facts of the case squarely on their merits and making a decision without bias or prejudice.

Mr. Moore, do you feel that you can do that in this case?

PROSPECTIVE JUROR MOORE: Yes.

THE COURT: Mrs. Ward, do you feel that you can?

PROSPECTIVE JUROR WARD: Yes, sir.

THE COURT: Is there any juror who feels that he cannot do this?

No hands are raised.

The challenges are denied.

■ The trial court described the potential jurors as acquaintances, which connotes merely familiarity with the identity of the witnesses. The record indicates friendship, viz., a relationship of affection, respect, or esteem. I cannot agree with the trial court that these potential jurors were not disqualified, because they could testify they would set aside those relationships and decide the case without bias or prejudice.

Article I, Section 12, Constitution of Utah, in mandatory terms, guarantees the accused in a criminal proceeding the right to a trial by an impartial jury. To comply with this command, the legislature enacted Chapt. 30, Title 77, in the Code of Criminal Procedure. To effect the purpose of a trial by an impartial jury, the legislature provided the accused with the right to challenge a juror for actual bias. Section 77–30–18(2), defines "actual bias" as "the existence of a state of mind on the part of the juror which leads to a just inference in reference to the case that he will not act with *entire impartiality*." (Emphasis supplied.)

■ "Impartiality" is not a technical conception but is a state of mind; it is a mental attitude of appropriate indifference.[1]

1. See 20 Words and Phrases, Impartiality, pp. 290–291.

A jury, in its role as a fact finder, must weigh the evidence and determine the credibility of the witnesses. A juror, who through a personal association with a witness or party has developed a relationship of affection, respect, or esteem, cannot be deemed disinterested, indifferent, impartial.

This point is illustrated in *State v. Jackson*,[2] wherein a prospective juror was challenged for cause. He had been a neighbor and friend and gone to church with several officers in the police department. In particular, he had been a close friend with Detective Lynes. Nevertheless, the prospective juror stated that if Detective Lynes contradicted the testimony of another witness he would not, because of his friendship, incline towards giving credence to his testimony. The trial court refused to excuse the prospective juror for cause, and defendant urged, on appeal, the ruling constituted prejudicial error. The court acknowledged the trial court is vested with broad discretionary powers in determining the qualifications of jurors, and its exercise of discretion will ordinarily not be disturbed on appeal.

. . . Nevertheless, we are satisfied that, under the particular circumstances here, the refusal to excuse Mr. Carolan constituted error which impaired the right of the defendants to competent and impartial jurors. His close relationship with members of the Elizabeth police department, particularly Detective Lynes, suggests inability to deal with the evidence with the measure of impartiality required by the law. It must be borne in mind that Detective Lynes was an important State's witness whose credibility was under direct attack. Though Mr. Carolan may have been wholly sincere in his statement that his long and close friendship with Detective Lynes would have no

bearing whatever on the issue of credibility, we find it difficult to accept for it runs counter to human nature. . . .

A juror is not in any position to weigh the evidence of his friend against the evidence of strangers and of the defendant so as to strike a balance between them as the law requires, viz., stand indifferent between the state and the accused.[3] Where there have been personal associations, such as the ones here; to remain uninfluenced, unbiased, and unprejudiced; runs counter to human nature. One cannot be deemed indifferent or impartial.[4]

The record clearly indicates prospective jurors Moore and Ward had such a relationship, with two important witnesses for the state, a just inference may be drawn they could not act with "entire impartiality." It was an abuse of discretion for the trial court to deny defense counsel's challenge for cause.

■ 77–30–12, provides two types of challenges to an individual juror, peremptory and for cause. 77–30–14 defines a peremptory challenge as "an objection to a juror for which no reason need be given, but upon which the court must exclude him." Defendant was entitled to four peremptory challenges (77–30–15(b)) all of which he exercised. However, since he had to use two of the four peremptory challenges to remove the two jurors he challenged for cause, he was effectively denied the use of two he might have used to remove other jurors whom he so desired.[5] Under such circumstances, there was prejudicial error.

A party is entitled to exercise his . . . peremptory challenges upon impartial prospective jurors, and he should not be compelled to waste one in order to accom-

2. 43 N.J. 148, 203 A.2d 1, 7–8, 11 A.L.R.3d 841 (1964).

3. *State v. Joiner*, 163 La. 609, 112 So. 503 (1927).

4. *West Hartford Education Assoc. v. West Hartford Board of Education*, 27 Conn.Sup. 421, 241 A.2d 780 (1968).

5. *State v. Chealey*, 100 Utah 423, 116 P.2d 377

plish that which the trial judge should have done.[6]

Defendant made a motion for a directed verdict, which the trial court denied. Upon appeal, defendant vigorously urges the evidence presented by the state was not sufficient to prove his guilt beyond a reasonable doubt.

It is the prerogative of the jury to judge the weight of the evidence, the credibility of the witnesses, and the facts to be found therefrom. For a defendant to prevail upon a challenge to the sufficiency of the evidence to sustain his conviction, it must appear that viewing the evidence and all inferences that may reasonably be drawn therefrom, in the light most favorable to the verdict of the jury, reasonable minds could not believe him guilty beyond a reasonable doubt. To set aside a verdict it must appear that the evidence was so inconclusive or unsatisfactory that reasonable minds acting fairly must have entertained reasonable doubt that defendant committed the crime. Unless the evidence compels such conclusion as a matter of law, the verdict must be sustained. In evaluating the evidence, is it so inherently improbable as to be unworthy of belief, that, upon objective analysis, it appears reasonable minds could not believe, beyond a reasonable doubt, the defendant was guilty[7]

A reasonable doubt is not a mere imaginary, captious, or a possible doubt, but a fair doubt, based upon reason and common sense, and growing out of the testimony of the case. It is such a doubt as will leave the juror's mind, after careful examination of all the evidence, in such condition that he cannot say that he has an abiding conviction, to a moral certainty, of the defendant's guilt.[8]

Defendant specifically challenges the sufficiency of the identification evidence, to show he was the perpetrator of the robbery.

The state presented two witnesses to establish the identification of defendant, the clerk in the store, Barry Lee Godwin, and a customer, who entered the store during the incident, Gary Charles Brown.

The following review of the evidence, in my view, sustains the presence of the element of reasonable doubt. The evidence consistently does not depart from such infirmity. Unfortunately, a majority of the court cannot be had for this view. However, I consider it to be of such importance as to require exposition.

Police officer Leishman responded to a call received at 10:25 p. m. At that time, Mr. Godwin described the robber as black, male, mid-to-late twenties, five feet nine inches in height, short Afro hair style , and cleanshaven. The officer asked specifically if the robber had a beard, mustache, or sideburns. Godwin replied he was clean shaven.

The following evening the officer presented Mr. Godwin with six photographs. Mr. Godwin positively identified exhibit C and stated that "C" was the man or his twin brother. This photograph was a picture of defendant taken October 21, 1971.

Mr. Godwin testified that at the time of the incident the store was well illuminated, he had an ample opportunity to observe the robber, and he specifically kept a watch on him so he would remember. At the trial he described the robber as six feet one inch in height. On cross-examination he admitted that at the preliminary hearing and in a written report he made two days after the robbery he described the robber as five feet six inches in height. To explain the discrepancy, Mr. Godwin testified he was on a platform which elevated him above the robber, and he estimated his height. He was of the opinion the robber was taller than average; that the height of the average male was five feet five inches, so he added

(1941); *State v. Cluff*, 48 Utah 102, 158 P. 701 (1916).

6. *Crawford v. Manning*, Utah, 542 P.2d 1091, 1093 (1975).

7. *State v. Mills*, Utah, 530 P.2d 1272–1273 (1975).

8. *State v. Williamson*, 22 Utah 248, 256, 62 P. 1022, 1024 (1900).

one or two inches. Mr. Godwin further stated that after the preliminary hearing on October 3, 1975, he recalled passing defendant, who was the same height as Mr. Godwin, six feet.

Two photographs, Exhibits G and H were introduced in evidence. Subsequently, these exhibits were identified by Deputy Sheriff J. R. Hunt, who testified the pictures were taken at 1:00 a. m., on June 25, 1975, and they were an accurate representation of the appearance of defendant. Furthermore, the general appearance of defendant was the same at the trial as at the time the pictures were taken. The photographs show defendant had a mustache, a goatee, and prominent bushy sideburns extending down to his jaw.

At the trial Mr. Godwin testified the robber was clean shaven; his lip was shadowed, but he did not have a mustache or goatee. He did not notice sideburns. He described the difference in defendant's appearance in court by observing he had whiskers on his chin, a mustache, and his hair was not as neatly groomed. He further stated he would only have noticed if the robber did not have sideburns extending to the jaw, because he expected young people to have them. He admitted that at the time he identified Exhibit C, the picture of defendant, he did not inform the police the robber was different in appearance, viz., that the robber had sideburns. Most importantly, Mr. Godwin admitted the man, who robbed him was clean shaven, and did not look like the man in the pictures in Exhibits G and H, who has a mustache and goatee.

Gary Charles Brown, a customer of the store during the robbery, testified, at trial; the robber was a black man, about six feet tall, who had a shadow of a mustache, wavy hair, but not an Afro. He testified he identified Exhibit C as the robber about three days after the incident. He admitted at time of trial it was the first time he had stated the robber was six feet tall; and previously, at the preliminary hearing, he had testified the robber was five feet eight or nine inches tall. He explained the discrepancy by stating that, at the trial, he

stood next to defendant and discovered he was six feet. (Mr. Brown is six feet, one inch). Mr. Brown admitted, in describing the robber at the preliminary hearing, he neither stated the robber had a mustache or a shadow on the lip. Furthermore, he did not state the robber had a goatee or a little bit of hair on his chin. He admitted the robber did not have long sideburns, as defendant had at trial. He admitted, in his report to the officers, he described the robber as having a smaller than average nose. In contrast, at the preliminary hearing, he testified the robber had a nose larger than normal with large nostrils which came down on his lip. He explained the discrepancy by stating the robber was wearing dark glasses, and at the preliminary hearing he was able to take a closer look at defendant.

Some very illuminating testimony came from Mr. Brown. He testified the exclusionary rule was invoked at the preliminary hearing, and he did not hear Mr. Godwin's testimony. However, prior to trial, the two witnesses met with the prosecutor and took turns giving testimony, which gave Mr. Brown an opportunity to become familiar with Mr. Godwin's version of the incident. The two witnesses in their discussion became aware that facial hair was a critical issue in the trial, whether they observed a mustache, a goatee, and long sideburns on the robber. The prosecutor showed them Exhibits G and H, and they discussed how they could explain the difference in facial hair as shown in the photographs, and the witnesses' previous statements. Mr. Brown freely conceded this discussion had a drastic effect on his testimony.

Certainly, such methods exceed the limits of the exclusionary rule. It goes without saying the bounds of propriety were exceeded. The rule was violated.

A tape of Mr. Brown's testimony at the preliminary hearing was played to the jury. Therein, he testified the robber walked past him at a distance of approximately two feet. He described the robber as five feet nine inches and stated he (the witness) was six feet ½ inch. He stated the robber had a

normal black man's hair, and he had no long sideburns, no mustache, no goatee or any type of facial hair. Mr. Brown testified he was sure of his identification; but, he conceded, blacks do look pretty much the same to him.

In his final testimony Mr. Brown stated the person who robbed the store did not have a mustache, sideburns or a goatee and was five feet nine inches tall. Mr. Brown insisted the person who robbed the store had two or three day's growth of hair on his lip, but it was not the type of mustache, which appears on the lip of defendant in Exhibits G and H, which were taken ·74½ hours after the robbery.

Deputy Sheriff Hunt testified three blacks were stopped by the police in Bountiful, on the date of the robbery. However, none of these men were included in the photographs displayed to the witnesses.

Leila Betty Gavros, the girl friend of defendant, testified extensively as to the activities of the two on the critical date. They went fishing at Pine View reservoir until 9:30 p. m. They returned to defendant's apartment in Ogden, Utah; and, while Miss Gavros bathed, defendant went to the store, at about 10:20 to 10:30 p. m. Defendant was gone about 20 minutes; he returned with the groceries. They ate dinner, watched television, and retired. She testified that on the date they went fishing, defendant had a mustache, sideburns, and goatee, and his hair was in pink sponge hair rollers.

Two ladies, Kathy and Margaret Anderson, who are sisters, testified that on June 21, 1975, they observed defendant near Huntsville, Utah at 5:00 in the afternoon. Defendant's father, Ralph Brooks, Sr., testified his son's appearance was the same on June 21, 1975, as at the time of the trial. Specifically, he had the same hair style, mustache, and sideburns. His goatee may not have been as thick, but he did have a definite goatee.

Janice Sandberg testified that she worked at Stimson's Market in Ogden, Utah. She recalls distinctly waiting on defendant at the grocery window on June 21, 1975. She remembers defendant, because he had pink sponge rollers in his hair. She remembers commenting to him she thought all black boys had naturally curly hair. Defendant contacted her the following Thursday and queried whether she remembered him and the time she waited on him. Mrs. Sandberg was specific in her statement the time was 10:30 p. m. She explained she was selling gas on Saturday, and the girl on the grocery window asked her to relieve her. Mrs. Sandberg looked at the clock which was 10:30 p. m., and it was at that time she waited on defendant. The prosecution attempted to show Mrs. Sandberg had been threatened by unknown black youths. Mrs. Sandberg discounted any fear of the threats and vigorously expressed the opinion defendant had not instigated the threats, since she had already assured him she would testify on his behalf.

Defendant testified in his own behalf. He related how he spent his Saturday on June 21, 1975 with Miss Gavros, and the incident when he purchased groceries at Stimson's Market. He testified he was arrested at 11:00 at night on June 24, by Officers Hunt and Leishman. At that time defendant was in his automobile on his way to work, and his appearance was the same as usual. His testimony was his sideburns and mustache were the same as at the time of trial; his goatee was not as long on June 21, 1975. Defendant admitted he told the police he was alone when he went fishing. He explained he did not know how many people were involved in the robbery, of which he was accused, and he did not want to have Miss Gavros accused or involved. Defendant was emphatic his appearance had not changed, between June 21 and June 25, 1975, the day the photographs in Exhibits G and H were taken. He further testified he requested the police conduct a lineup; such a procedure was never followed.

The foregoing review of the evidence, clearly indicates it was so inconclusive and unsatisfactory, as to the identification of defendant, that reasonable minds would have to entertain a reasonable doubt defendant was the robber. The evidence com-

pels such conclusion as a matter of law. It is highly unlikely defendant could in a period of 74½ hours grow a goatee, a mustache, and long bushy sideburns extending to his jaw, such as are in evidence here. The discrepancies of the two witnesses, who were defendant's height, concerning the height of the robber further discredit the identification. Exhibit C the photograph by which the two witnesses identified defendant for the police was taken almost four years prior to the crime. Exhibit C is the picture of a clean shaven youth. Exhibits G and H, pictures taken of defendant 74½ hours after the crime, show a mature man with extensive facial hair. There is little resemblance between the youth in Exhibit C and the man in Exhibits G and H. Both identification witnesses admitted the clean shaven robber did not look like the man in Exhibits G and H. It would appear it is not a mere imaginary, captious, or possible doubt, but a reasonable doubt, viz., a fair doubt based upon reason and common sense and emerging from the testimony of the case, that defendant committed the crime.

WILKINS and HALL, JJ., concur.

ELLETT, C. J., concurs in result.

CROCKETT, Justice (dissenting):

The rule is so elementary as to be universally recognized: that it is the prerogative of the trial judge to examine and pass on the qualifications of jurors; and that this includes their credibility in answering questions as to their qualifications.[1] In this instance the trial judge believed the two jurors referred to when they swore under oath that they could set aside other considerations and act as fair and impartial jurors. It seems to me that it is a diametric departure from the rule above stated for this court to now decide that those jurors swore falsely and that the trial court was stupid or at least foolish to believe them. I cannot agree with such reasoning. I prefer to follow what I regard as the correct presumptions to the contrary: that the jurors told the truth; that the trial court believed them and that the jurors were thus properly qualified.

What has been said above concerning the prerogatives of the trial judge in judging the credibility of the jurors has analogous application to the prerogatives of the jury in judging the credibility of witnesses. It is not the proper function of this Court to invade that province by making a labored effort to pick out possible flaws or inconsistencies in some aspects of the evidence and to assume that because of some superior insight on our part we can better judge the credibility of the witnesses than could the jury who found the verdict, or the trial court who approved it by letting it stand.

I think it neither necessary nor appropriate to indulge in any extenuation concerning other aspects of the evidence as to why the jury should or should not have believed the witnesses, nor why, upon the whole evidence, they believed beyond a reasonable doubt that the defendant was guilty.

It is also important to observe that even if error was committed which a majority of this court deems to be prejudicial and that therefore the verdict should be nullified and the judgment reversed, the defendant is not entitled to go free, but is only entitled to a new trial. See *United States v. Ewell,* 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627; *State v. Lawrence,* 120 Utah 323, 234 P.2d 600; *State v. Kessler,* 15 Utah 142, 49 P. 293. Furthermore, the new trial should be solely and exclusively upon the evidence to be presented therein, with the trial court and the jury to exercise their respective prerogatives as stated above in regard to judging that evidence; and without any analysis of the evidence indicating a prejudgment of the case. That the court should honor the right of trial by jury by refraining from commenting on the evidence, see *State v. Green,* 78 Utah 580, 6 P.2d 177, and *Federated Milk Pro. Assn. v. Statewide Plumb. & H. Co.,* 11 Utah 2d 295, 358 P.2d 348.

1. *State v. Brosie,* 24 Ariz.App. 517, 540 P.2d 136 (1975).