Ivan JENKINS, Plaintiff and Appellant,

v.

Charles M. PARRISH, Defendant and Respondent.

No. 15905.

Supreme Court of Utah.

March 13, 1981.

D. Clayton Fairbourn, Salt Lake City, Marden G. Dixon, Provo, for plaintiff and appellant.

David W. Slagle, Salt Lake City, for defendant and respondent.

STEWART, Justice:

Plaintiff, Ivan Jenkins, brought this medical malpractice action against defendant, Dr. Charles M. Parrish, alleging that as a result of the defendant's negligence during plaintiff's heart surgery he suffered partial blindness, loss of coordination, impairment of equilibrium, memory loss, personality changes and slowness of speech. After a trial of nine days, a jury found the issues in favor of defendant. Subsequently, the trial court denied plaintiff's motion for judgment notwithstanding the verdict or for a new trial.

Plaintiff appeals, contending the trial court erred (1) in refusing to remove a juror for cause, (2) in its rulings on evidence, and (3) in its rulings on the jury instructions.

In February 1972 plaintiff, who suffered from heart problems, was examined by defendant who advised him to undergo a cardiovascular bypass operation. Defendant performed the surgery on February 21. The claim for relief arises in this case, not from the actual repair of the heart, but rather from the effects of improper blood perfusion during surgery. Plaintiff contends that inadequate pressures and amounts of oxygenated blood to vital organs, specifically the brain and eyes, caused the above-described postoperative conditions.

During the operation, the heart-lung machine is primed with blood and used to circulate blood and cool the blood as it is circulated. The machine acts in place of the heart during the operation. It circu-

lates the patient's blood through the arteries and veins and at the same time oxygenates the blood. Plaintiff contends, and his expert witness testified, that certain procedures designed to insure adequate blood flow from the heart-lung pump were omitted and certain other procedures fell below the standard of acceptable minimum care exercised by experts in the same field.

Neither Dr. Parrish nor his technician kept records of the blood pressure during the time the patient was dependent upon the heart-lung pump machine, even though blood pressure is admittedly an important factor in such procedures. A record was maintained of the blood flow rate. However, as a result of the technician's failure to calibrate the machine according to the particular size of tubing used during plaintiff's operation, the readings were inaccurate. Therefore, the volumes in 1,000 cc's per minute recorded by the technician were incorrect. Both the defendant, Dr. Parrish, and one of plaintiff's experts, Dr. Bailey, stated that the flow rates recorded were in error. As a result the technician and the surgeon did not know the actual blood flow rate into the patient during surgery.

Dr. Parrish excused the error by stating that he relied on the patient's blood pressure rather than the flow rate, in spite of the fact that no blood pressure readings were maintained. He further admitted that there were instances where the flow rate would change even though the blood pressure remained constant. One instance when this could occur is when drugs are administered that cause vasodilation which may cause pooling of blood in the veins. When pooling occurs, blood does not return to the pump, and the flow rate goes down. Dr. Parrish admitted that large amounts of morphine were used on the patient. Although Dr. Bailey testified that morphine is a venous vasodilator, Dr. Parrish testified that he was not sure whether it was.

Dr. Bailey testified that the blood pressure and the blood flow were permitted to fall to dangerously low levels. In contrast, however, defendant's expert witnesses testified that no procedure during plaintiff's operation fell below the standard of care practiced in 1972 in Salt Lake City.

## QUALIFICATION OF JURORS

The plaintiff first assigns as error the failure of the trial court to remove a Mrs. Judith Eddins as a juror.

After the court had conducted an extensive voir dire examination of the jury panel, including the question as to whether the fact that a medical doctor was the defendant might have some bearing on their deliberations, three jurors—Mrs. Judith Eddins, Mrs. Virginia Birkner, and Mr. James Hewett—were challenged for cause. Thereafter, the court conducted a more detailed examination of those jurors in chambers. As a result, plaintiff's challenge for cause was allowed as to jurors Birkner and Hewett, but not as to Mrs. Eddins.

Rule 47(f)(6), Utah Rules of Civil Procedure, allows a challenge for cause upon the grounds "[t]hat a state of mind exists on the part of the juror with reference to the cause, or to either party, which will prevent him from acting impartially and without prejudice to the substantial rights of the party challenging."

On voir dire it was established that Mrs. Eddins' father was a medical doctor and she had been married to a veterinarian who had been a defendant in a malpractice suit. Mrs. Eddins admitted that she would favor the defendant physician's testimony:

THE COURT: Would you be inclined to give more weight to the testimony of—well, perhaps I'd better not ask it that way. Even though your father is a medical doctor, do I understand that you do not believe that you would be able to listen to the evidence and based thereon render a fair and impartial verdict? Or, let me put it another way: Do you think if you were selected as a juror that you would be able to listen to the evidence and based thereon render a fair and impartial verdict?

VENIREMAN EDDINS: I definitely believe they can make mistakes. I would hope I could listen to it. *But I know I would be somewhat partial to the doctor.*

THE COURT: Well, are you telling me that you would give more weight to the testimony which would be presented on behalf of the defendant in this action simply because he happens to be a medical doctor?

VENIREMAN EDDINS: No, I think I could weigh the evidence. I think when it got to his personal testimony that would be the only time it would possibly influence me, and I would feel it was more likely to be truthful than untruthful.

THE COURT: And I take it, then, your answer would be that *you would give more weight to his testimony simply because he's a doctor?*

VENIREMAN EDDINS: *I'm afraid so.* [Emphasis added.]

Subsequently, the following exchange occurred:

THE COURT: If the evidence indicated that the doctor's testimony was not in accordance with the evidence, would you still be inclined to give more weight to his testimony simply because he was a doctor?

MRS. EDDINS: No, I think I could see it.

This examination clearly discloses that Mrs. Eddins would credit the doctor's testimony to an undue extent. Even though the juror conceded that if the doctor's testimony was not in accord with the evidence, she would accept the other evidence, that does not obviate the prejudice. The overriding question is the credibility she would accord the doctor's testimony in the first instance. Also, who can say how strong or persuasive the contradictory evidence would have to be for her to accept it? In short, the problem is glutted with a tendency for prejudice. Upon the trial court's denial of plaintiff's motion to remove Mrs. Eddins from the jury panel, the plaintiff exercised one of its peremptory challenges to do so.

■ In selecting a panel of jurors who are fair and impartial, some deference must be accorded the discretion of the trial court. *State v. Dixon,* Utah, 560 P.2d 318 (1977); *State v. Amodei,* 222 Kan. 140, 563 P.2d 440

(1977); *Wasko v. Frankel,* 116 Ariz. 288, 569 P.2d 230 (1977). Due consideration should be given to the trial judge's somewhat advantaged position in determining which persons would be fair and impartial jurors, *Lambert v. Sisters of St. Joseph of Peace,* 277 Or. 223, 560 P.2d 262 (1977), and his determination should not be disturbed unless he abuses his discretion. *Webber v. Patton,* 221 Kan. 79, 558 P.2d 130 (1976); *Lambert v. Sisters of St. Joseph of Peace, supra.* Nevertheless, we also view the exercise of discretion in light of the fact that it is a simple matter to obviate any problem of bias simply by excusing the prospective juror and selecting another. A party should not be forced to use a peremptory challenge when a juror should be excused for cause, *State v. Brooks,* Utah, 563 P.2d 799 (1977); *State v. Moore,* Utah, 562 P.2d 629 (1977); *Crawford v. Manning,* Utah, 542 P.2d 1091 (1975); *Wasko v. Frankel, supra.*

■ Although Mrs. Eddins expressed a desire and ability to remain fair and impartial once all the evidence was presented, her statements do not alter the fact that she indicated that her background would cause her to place greater credence in a doctor's testimony simply because of his status as a doctor. A statement made by a juror that she intends to be fair and impartial loses much of its meaning in light of other testimony and facts which suggest a bias. *Lambert v. Sisters of St. Joseph of Peace, supra.*

In *Crawford v. Manning,* Utah, 542 P.2d 1091 (1975), this Court held that a prospective juror's strong feelings about wrongful death actions should have resulted in a dismissal for cause, even though she stated that she could be an unbiased juror in spite of her feelings. "One doubts that a person who harbors strong feelings concerning anyone who would sue to recover money for the death of another could be a fair and impartial juror." *Id.* at 1092.

Mrs. Eddins' admissions of expressed bias in the instant case should have resulted in a successful challenge for cause pursuant to Rule 47(f)(6). Forcing plaintiff to use one of his peremptory challenges to remove the

juror resulted in prejudicial error. See *Crawford v. Manning, supra.* As stated in *Wasko v. Frankel,* 116 Ariz. 288, at 290, 569 P.2d 230, at 232 (1977):

> Peremptory challenges form an effective method of assuring the fairness of a jury trial. Hence, forcing a party to use his peremptory challenges to strike jurors who should have been stricken for cause denies the litigant a substantial right.

### RULINGS ON EVIDENCE

Plaintiff assails the trial court's rulings with respect to the testimony of Charles Dyson, a heart-lung bypass pump machine technician from Los Angeles and Dr. Bailey, an out-of-state cardiovascular specialist. Both were called by plaintiff as experts having had experience in cardiovascular bypass surgery in major cities other than Salt Lake. Plaintiff urges that the trial court erred in its evidentiary rulings as to the "similar locality" rule and instead applied the more restrictive "same locality" standard.

■ The facts of the instant case clearly call for the application of the similar locality rule. *Swan v. Lamb,* Utah, 584 P.2d 814 (1978). See also *Farrow v. Health Services Corp.,* Utah, 604 P.2d 474 (1979). The defendant, practicing in a field as specialized as cardiac bypass surgery in a major city and holding himself out as a nationally trained and Board certified expert, should be held to the same national standard of care adhered to by qualified fellow experts in similar medical centers. A fraternity of highly-specialized and sophisticated surgeons with national organizations committed to the dissemination of the most current medical knowledge and standards in the field should clearly be held to one common standard. The majority of jurisdictions in the United States have rejected the same locality rule, *Morrison v. MacNamara,* D.C., 407 A.2d 555 (1979). See cases collected in 37 A.L.R.3d 420 (1971).

1. Even though this case was tried before this Court handed down *Swan v. Lamb, supra,* the trial court nonetheless instructed the jury on the basis of the rule adopted in that case. It is

In *Swan v. Lamb, supra,* this Court held that a doctor in Salt Lake City should be held to the same standard of care as that which prevailed in similar localities. It was observed that the "similar locality" rule is "but a specialized application of the standard of conduct so universally imposed by the law: of requiring the degree of care which the ordinary, reasonable and prudent person would observe under the same or similar circumstances." (Crockett, J., concurring specially, 584 P.2d at 819.)

Our view of the record reveals that an adequate foundation was laid as to both Mr. Dyson and Dr. Bailey but that the trial court was overly restrictive in sustaining objections to questions presented to plaintiff's experts in reference to the standards of care in cardiovascular bypass surgery and the operation of a bypass pump by qualified persons in localities similar to Salt Lake City.[1] Mr. Dyson was prevented from answering a number of questions based on the standards in similar locations, although he was permitted to testify in a general fashion as to the standard of care with respect to various practices; but that did not cure the error.

Dr. Bailey's testimony as to the appropriate standard of care was also permitted only after counsel couched the questions either in terms of a personal opinion or in reference to a Salt Lake standard. In that context he answered questions relating to the impropriety of certain of the procedures that were followed. He was not permitted to testify to standards in similar localities. Defendant presented doctors who were all Salt Lake City based expert witnesses. The limitations on the scope of Dr. Bailey's testimony severely undermined, if not precluded, the jury's ability to determine, according to the instructions given, whether the practices pursued in this case met or fell short of the standard of care in other, similar areas.

clear that the rule in *Swan* should govern on this appeal. *Farrow v. Health Services Corp.,* Utah, 604 P.2d 474 (1979).

■ Plaintiff next argues that the trial court erred in refusing to allow plaintiff's expert to authenticate texts, which Dr. Parrish had failed to recognize as authoritative, in order to use those texts to cross-examine the defendant.

This is not a case where Dr. Parrish depended solely on his own experience without reliance on medical literature; nor is it the case that the defendant physician who was to be cross-examined on the basis of a text disavowed the authority of that text. On the contrary, Dr. Parrish, having relied on certain medical literature as a basis for his opinions, flatly denied all knowledge of the apparently standard textual materials asked about on cross-examination. His response to questions on cross-examination revealed unfamiliarity with the authors of the books and lack of knowledge of the texts written by them. As a consequence, Dr. Parrish was unable either to acknowledge or to disavow the authority of the books referred to on cross-examination. To allow an expert witness's inability to authenticate texts, written on the very subject to which he has testified, to extinguish a cross-examiner's opportunity to discredit that witness's direct testimony by reference to such texts would establish a rule of evidence which protects those experts who are undereducated or not current in their field. Accurate fact-finding is not enhanced by experts who are deficient in their knowledge of the subject matter of their testimony. To prevent cross-examination based on such texts "serves only to protect the ignorant or unscrupulous expert witness." *Darling v. Charleston Community Memorial Hospital,* 33 Ill.2d 326, 336, 211 N.E.2d 253, 259 (1965). Addressing this issue, the court in *McCay v. Mitchell,* 62 Tenn.App. 424, 445, 463 S.W.2d 710, 720 (1970), stated:

> The object of using the authoritative books and treatises was to test the experts' testimony by having them refer to and comment upon the contents thereof. The books and treatises were not offered as proof of the subject matter therein expressed, but rather to test the knowledge and accuracy of the experts. Under these circumstances we hold the Trial

Judge erred in refusing the plaintiff the right to use authoritative medical text books and treatises in the cross-examination on the ground the experts had not read the works referred to. *To hold otherwise would be to render more valid, and beyond the realm of contradiction, the opinion of the less read and probably poorer expert over the opinion of the better read and probably more competent expert.* [Citations omitted.] [Emphasis added.]

*Gridley v. Johnson,* Mo., 476 S.W.2d 475, 481 (1972), reached a similar conclusion:

> We reject the proposition that the expert witness being cross-examined must first agree that the text is standard or authoritative. The practical effect of such cross-examination would be to give the witness complete control of the cross-examination. He need only say that he is not acquainted with the book or its author to prevent its use in testing his qualifications, no matter how eminent or accepted the author may be. The fewer books and authorities the witness knows about or will acknowledge and the less knowledge he has of what has been written in the field, the more difficult it will be to cross-examine him along this line. It gives him full veto power over the cross-examiner's efforts.

The need for this type of cross-examination has long been recognized by the United States Supreme Court:

> It certainly is illogical, if not actually unfair, to permit witnesses to give expert opinions based on book knowledge, and then deprive the party challenging such evidence of all opportunity to interrogate them about divergent opinions expressed in other reputable books. [*Reilly v. Pinkus,* 338 U.S. 269, 275, 70 S.Ct. 110, 114, 94 L.Ed. 63 (1949).]

See also 6 *Wigmore on Evidence* § 1700 (Chadbourne rev. 1976).

In short, we hold that an expert's failure to read, rely on, or accredit a particular authoritative text does not prevent cross-examination as to that work, if the cross-

examining party otherwise proves its authoritative nature by independent evidence. *McCay v. Mitchell*, 62 Tenn.App. 424, 463 S.W.2d 710 (1970). Proof by any competent expert witness within a specific discipline that a book is authoritatively used and relied upon within the discipline satisfactorily establishes the authority of a work so as to allow its use in cross-examination. *William Cameron Co. v. Downing*, Tex.Civ.App., 147 S.W.2d 963 (1941).

Independent testimony by a qualified member of the profession to establish that a book is generally accepted among authorities in the field provides the necessary safeguard against the use on cross-examination of works by authors of questionable credentials espousing ill-grounded theories. Indeed, effective cross-examination designed to disclose the truth is enhanced by use of a written text which, as opposed to oral expert testimony, may provide more reliable safeguards of trustworthiness. The anticipation by an author of the scrutiny by one's peers and the prospect of professional criticism promotes accuracy in the writing of an academic work. Further, a professional work is not written with the purpose of addressing an individual person's interest on a given issue in a lawsuit, and the work is not likely to fall suspect to the distrust which surrounds an expert witness who is being paid to take a partisan view, nor is it likely to be shaded, either consciously or unconsciously, to promote a particular litigant's theory. 6 *Wigmore on Evidence* § 1692 (Chadbourne rev. 1976). Authors of the texts "are at least as trustworthy, though unsworn and unexamined, as perhaps the greater portion of those who take the stand for a fee from one of the litigants." *Id.* at 7.

For these reasons a number of jurisdictions have adopted the rule that an expert may be cross-examined on the basis of scientific or technical works with which they are not familiar if they are otherwise established as authoritative. *Reilly v. Pinkus*, 338 U.S. 269, 70 S.Ct. 110, 94 L.Ed. 63 (1949); *Reck v. Pacific-Atlantic S. S. Co.*, 180 F.2d 866 (2nd Cir. 1950); *Briggs v. Zotos International, Inc.*, 357 F.Supp. 89 (E.D.Va.1973); *Ravenis v. Detroit General Hospital*, 63 Mich.App. 79, 234 N.W.2d 411 (1975); *Gridley v. Johnson*, Mo., 476 S.W.2d 475 (1972); *Iverson v. Lancaster*, N.D., 158 N.W.2d 507 (1968); *Evanuik v. University of Pittsburgh Western Psychiatric Institute and Clinic*, 234 Pa.Super. 287, 338 A.2d 636 (1975); *Darling v. Charleston Community Memorial Hospital*, 33 Ill.2d 326, 211 N.E.2d 253 (1965); *McCay v. Mitchell*, 62 Tenn. App. 424, 463 S.W.2d 710 (1970).

In the instant case plaintiff called his own expert witness to obtain verification of the books' authority and was denied an opportunity to elicit the necessary authentication. The lower court sustained defendant's objection on grounds of irrelevancy and immateriality. By failing to allow plaintiff to authenticate the source materials, the trial court eliminated their availability for use on cross-examination and substantially curtailed plaintiff's ability to adequately cross-examine Dr. Parrish.

■ Utah has not at this point adopted the learned treatise exception to the hearsay rule, and therefore scientific works are not admissible as independent proof of facts therein stated. However, their use should not be proscribed in cross-examination to shed light on an expert witness's knowledge and expertise. Since the texts in this case were not offered as substantive evidence, but rather to discredit the witness's testimony, there was no hearsay problem. See *McCay v. Mitchell, supra, City of St. Petersburg v. Ferguson*, Fla.D.C.A., 193 So.2d 648 (1967), overruled on other grounds, *Employer's Fire Ins. Co. v. Continental Ins. Co.*, 326 So.2d 177 (1976).

The lower court's failure to allow plaintiff to independently authenticate professional works and consequently to use them on cross-examination of an adverse expert witness who professed no knowledge of the works resulted in prejudicial error by substantially curtailing plaintiff's ability to attack the testimony of Dr. Parrish. The mere establishment of a witness's unfamiliarity with standard texts, without further interrogation, does not necessarily reflect a

lack of knowledge or a failure to keep current. Only reference to the contents of a text during cross-examination can adequately serve to test the knowledge and technique of the expert witness and to discredit his testimony if they are found wanting.

The limitation placed by the trial court on the right to cross-examine permits a witness's unfamiliarity with standard texts to result in freedom from contradiction or discredit. Prejudice to the cross-examining party arises naturally from that improper restriction on cross-examination. Failure to permit cross-examination involving independently authenticated standard material prevents a true testing of a witness's knowledge, accuracy and expertise. The necessary consequence here was to withhold from the jury evidence necessary to properly evaluate and appropriately weigh Dr. Parrish's testimony.

Because of the above errors, we reverse the judgment of the trial court and remand for a new trial. This disposition of the case renders it unnecessary to address the remaining issues raised by plaintiff.

Costs to appellant. So ordered.

MAUGHAN, C. J., and WILKINS, J.,* concur.

CROCKETT, Justice (dissenting): **

It is my opinion that if the proceedings in the district court, the jury verdict, and the judgment are accorded the presumptions of verity they are entitled to, there is not a sufficient showing of error prejudicial to the plaintiff to justify upsetting the judgment.

It should be kept in mind that in the selection of jurors, sometimes involving considerable numbers in order to choose a suitable panel, there often arise some twilight areas in which the trial judge must exercise his judgment as to whether prospective jurors evidence the qualifications to be fair, honest and impartial; and the practicalities of such situations are that the trial judge must have considerable latitude of judgment in making that determination.

The main opinion correctly states that "in selecting a panel of jurors . . ., some deference must be accorded the discretion of the trial judge." And further, that the juror in question, Mrs. Eddins, "expressed a desire and ability to remain fair and impartial once all of the evidence was presented . . ." It seems to me that if the stated rule is applied, the matter of her qualification was within the discretion of the trial court. Moreover, after the proceedings of choosing the jury had been completed, the jury was sworn and the trial proceeded for nine days without any further complaint or motions attacking the composition of the jury.

The main opinion also correctly observes that in *Swan v. Lamb*, Utah, 584 P.2d 814, this Court recognized that the "similar locality" rule is but a specialized application of the standard of conduct so universally imposed by the law, requiring the degree of care which the ordinary, reasonable and prudent person would observe under the same or similar circumstances. It is plainly apparent from the record that it was the "similar locality" rule which was applied throughout the trial. Mr. Charles Dyson admitted that he did not have specific knowledge of practices in Salt Lake City, but stated that there was a standard of practice among perfusion technicians throughout the country (it hardly needs to be stated that Salt Lake City is included therein) and he described the standard procedure followed in maintaining an adequate blood-flow rate and the necessity that that rate, body temperature and blood pressure be monitored at certain intervals during the operation. He further testified that the flow rate present during the plaintiff's operation was the lowest minimum standard. In considering the question as to whether any error prejudicial to the plaintiff occurred, it is also to be observed that, in addition to the testimony of Mr. Dyson, Dr. Charles P. Bailey testified on plaintiff's behalf on that subject.

---

* WILKINS, J., acted on this case prior to his resignation.

** CROCKETT, J., wrote his dissenting opinion before his retirement.

The trial court's instructions were consistent with the "similar locality" concept. He told the jury that the plaintiff had the burden of proving

> ... that the defendant did not exercise such care and diligence in his treatment and operations upon the plaintiff, as was ordinarily exercised by skilled physicians and surgeons doing the same type of medical work and specialty *in this or similar locality at the time* ....

Further, that:

> The standard of care by which the doctor is to be judged by you is that degree of learning, care, skill and treatment ordinarily possessed and used by other thoracic and cardio-vascular surgeons in good standing *in this or a similar locality* in 1972.

Several other instructions were to the effect that a physician and surgeon has a duty to possess "that degree of learning and skill ordinarily possessed by physicians and surgeons of good standing practicing in the same locality or similar locality." Likewise, with respect to the skill of a specialist, the jury was instructed that he was held to the same degree of learning and skill of other specialists "in the same or similar localities."

Plaintiff assigns error in the trial court's sustaining of objections to examination concerning certain medical texts. In cross-examining the defendant, the plaintiff's counsel had attempted without success to elicit authentication concerning such texts. In the examination of Dr. Bailey, the plaintiff's counsel again sought to elicit authentication of the texts. Defendant's counsel interposed a multifaceted objection, to which plaintiff's counsel responded:

> Your Honor, these are foundation questions. I propose to have the book authen-

ticated by this doctor so that *if it is necessary and appropriate* at a later time it may be used for cross-examination *of other witnesses.*

(All emphasis herein is added.)

The court sustained the objection. With respect thereto, I make these observations: As the main opinion indicates, the recital of statements in medical books and treatises is not competent to prove the truth of such statements.[1] But, I have no doubt that under appropriate circumstances, a witness may be questioned concerning standard texts in order to demonstrate his knowledge and expertise, nor that they may be used for cross-examination of experts to test their knowledge or to contradict or discredit them.[2]

Learned discussions as to the admissibility of evidence such as are advocated by appellant for reversal are duly appreciated because they are instructive.[3] But this Court's purpose on review should be to determine whether any error has occurred in the trial which has prevented either party from having a full and fair opportunity to present his side of the case, so there is a reasonable likelihood that an injustice resulted in that there may have been a different result. In applying that rule, the plaintiff's assignment of error in sustaining the objection under scrutiny here should be judged in the light of the circumstances in which it occurred.

I would see no impropriety in the plaintiff's questioning Dr. Bailey about the texts (within reasonable limits) for the purpose of showing his qualifications in being familiar with them. However, plaintiff's counsel indicated that the purpose of questioning him was to use the text later in cross-examination of the defendant, and that is the basis to which the objection was sustained. The

---

1. *Dabroe v. Rhodes Co.*, 64 Wash. 431, 392 P.2d 317 (1964); *Purcell v. Zimbelman*, 18 Ariz.App. 75, 500 P.2d 335 (1972).

2. *Hope v. Arrowhead and Puritas Waters, Inc.*, 174 Cal.App.2d 222, 344 P.2d 428 (1959); *Dabroe v. Rhodes Co.*, supra, note 6, 392 P.2d at 321; *Dilts v. Baker*, Colo.App., 477 P.2d 800 (1970).

3. This is said with due deference and appreciation for the scholarly discussion in the main opinion and without necessarily disagreeing with the doctrine espoused therein if applied under appropriate circumstances where the issue might be critical to the justice of the cause.

defendant had already admitted that he did not know anything about them, but he stated that, due to the rapidly changing developments in the area of cardio-vascular surgery, his information as to new trends came mainly from monthly periodicals and not textbooks. I do not see how any further useful purpose could be served by confronting a witness with a text which he had never read, nor recognized as any authority, nor relied on in formulating his opinion.[4] It would seem that whatever discreditation of the defendant that could be achieved had been done by showing that he was utterly ignorant and uninformed about them. The only other purpose I can see in pursuing the stated purpose of cross-examining the defendant about the text would have been to use that indirect method to get their content in evidence. This even the plaintiff does not contend would be permissible.

In the absence of angels, our system of justice is carried on by mere mortals, with all of our faults and frailties and differences in points of view. Due to the multiplicity of factors involved, it would be almost impossible to complete such a trial without some things occurring which counsel, if he loses the case, can blame as causing the loss.

No one should expect a perfect trial. What the parties are entitled to is a full and fair opportunity to present their respective contentions to a court and jury and have their disputes resolved. When that is accomplished, in the interest of fairness to both sides, and of respecting and supporting the integrity of judicial proceedings, the jury verdict and judgment should be regarded as final, and accorded the presumptions of verity. Consistent with that purpose, it is established by our rules,[5] and by our decisional law, that a judgment should not be overturned merely because there may have been some errors or irregularities, but only if they are of sufficient gravity that there is a reasonable likelihood that an injustice has resulted and that in their absence there may have been a different result.[6]

I willingly agree that the issue here confronted, as to whether the plaintiff is entitled to have the judgment overturned and have a new trial, is not so unmistakably clear as to be without doubt. Nevertheless, any such doubts should be resolved in favor of the validity of the judgment. In doing so, on the basis of what has been said herein, I am not persuaded that the plaintiff has sustained his burden of showing prejudicial error to justify overturning it.

HALL, J., concurs in the dissenting opinion of CROCKETT, J.

4. 32 C.J.S., Evidence, sec. 574(1); *Ross v. Colorado Nat'l. Bank of Denver*, 170 Colo. 436, 463 P.2d 882 (1970); *Purcell v. Zimbelman*, supra, 18 Ariz.App. 75, 500 P.2d 335 note 6.

5. See Rule 61, U.R.C.P.; *Rowley v. Graven Bros. & Co.*, 26 Utah 2d 448, 491 P.2d 1209 (1971).

6. *Hales v. Peterson*, 11 Utah 2d 411, 360 P.2d 822 (1961).